**BIRTHRIGHT, Plaintiff,**

v.

**BIRTHRIGHT, INC. and Birthright of Woodbury, Inc., Defendants.**

**Civ. A. No. 92–1837(SSB).**

United States District Court, D. New Jersey.

July 23, 1993.

Susan Singer, Singer & Goger, Newark, NJ, Roberta Jacobs–Meadway, Panitch Schwarze Jacobs & Nadel, Philadelphia, PA, for plaintiff.

Thomas F. McGuire, III, Pennsauken, NJ, and Robert J. Brooks, Washington, DC, for defendants.

## AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW (pursuant to order dated July 21, 1993)

BROTMAN, District Judge.

Before the court is a trademark infringement and unfair competition case brought by plaintiff Birthright under the Lanham Act, 15 U.S.C. § 1051 *et seq*, and the common law. Count I of plaintiff's second amended complaint states a claim for trademark infringement under Section 32, 15 U.S.C. § 1114. In count II, plaintiff makes a claim of unfair competition under Section 43(a)(1)(A), 15 U.S.C. § 1125(a)(1)(A). In count III, plaintiff alleges a claim of false or misleading representations of fact under Section 43(a)(1)(B), 15 U.S.C. § 1125(a)(1)(B). Finally, count IV is a pendant state claim of common law unfair competition. Plaintiff seeks injunctive and monetary relief, as well as an award of attorneys' fees. Also before the court are defendants' counterclaims for common law unfair competition, breach of contract, and defamation.

Plaintiff filed suit on April 24, 1992. The court held hearings on the parties' motions for preliminary relief on July 17, August 10, and August 11, 1992. On October 5, 1992,

the court, with the consent of the parties, ordered the consolidation of the hearings on preliminary relief with the trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2). On December 26, 1992, defendants submitted proposed findings of fact and proposed conclusions of law. On December 28, 1992, plaintiffs submitted the same. After careful consideration of the entire record in this matter, the court enters the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

### Findings of Fact

1. The "Birthright" name is a service mark, registered with the United States Patent Office in the name of plaintiff Birthright. The "Birthright" name functions to identify the kind of pregnancy counselling services offered by the entities affiliated with the Birthright movement. Pl.'s Exs. 7, 7A, 7B.

2. The stylized "B" logo is an unregistered service mark that also functions to identify the kind of pregnancy counselling services offered by the entities affiliated with the Birthright movement. The logo consists of the letter "B" in heavy print, surrounding the silhouette of a telephone handset that resembles a fetus. Defs.' Ex. 5 (Louise Summerhill, *The Story of Birthright* 19 (1973)).

### I. *The Parties, Witnesses, and Key Figures*

3. Plaintiff Birthright is a Canadian corporation, organized on February 4, 1969 under the laws of Ontario by Louise Summerhill ("mother Louise") and others, with offices in Toronto, Canada. Pl.'s Ex. 19.

4. Mother Louise was the founder and dominating figure in the Birthright movement from its origins until the time of her death in August 1991. II Tr. at 46, 53, 83, 210. At all times relevant to this litigation, mother Louise's actions were taken in her official capacity as a member of the Board of Directors of plaintiff Birthright. II Tr. at 276.

5. Louise R. Summerhill ("daughter Louise") is one of three co-presidents and a member of the board of directors of Birthright. She is the daughter of mother Louise. I Tr. at 24, 31.

6. Defendant Birthright, Inc. is a United States corporation, organized on June 17, 1972 under the laws of New Jersey by mother Louise and others. Defs.' Ex. 1; II Tr. at 209.

7. Joan Evelyn Coleman has been active in the Birthright movement since the summer of 1971 and currently serves on the board of directors of Birthright, Inc. She is also the director of a Birthright chapter in Alexandria, Virginia, and holds the positions of regional consultant and regional representative. II Tr. at 154–55.

8. Denise Cocciolone is the executive director and member of the board of directors of defendant Birthright Inc. and a member of the board of directors of Birthright of Woodbury ("Woodbury Birthright"). Defs.' Ex. 11 ("Aff. of Cocciolone") ¶ 1. She is the leading figure of both Birthright Inc. and Woodbury Birthright, and controls and directs these two entities. II Tr. at 295. Cocciolone first became involved in the Birthright movement in 1970, and she formerly served as the national director for Birthright in the United States. II Tr. at 202.

9. Terry Weaver is a member of the board of directors of Birthright and the national director for Birthright in the United States. She assumed these positions in September 1991. She first became active in the Birthright movement in 1969, when she founded an Atlanta chapter. She has also served as a regional consultant and as a co-national director for Birthright. II Tr. at 86, 87, 92.

10. Bernadette Sanders is the director of the Wichita, Kansas Birthright Center, which she founded in 1971. She also serves as a regional consultant for Birthright. II Tr. at 127.

11. Defendant Woodbury Birthright is a United States corporation, organized on November 17, 1975 under the laws of New Jersey. Pl.'s Ex. 58. Its offices are located in Woodbury, New Jersey. Before its incorporation, Woodbury Birthright operated as an unincorporated entity since December 1970. II Tr. at 204. On December 1, 1971, plaintiff Birthright issued Woodbury Birthright a charter document making the latter a "Chartered Member of Birthright" with the

right to use the "Birthright" name.[1] Woodbury Birthright is located at the same address as Birthright, Inc., and is directed and controlled by Denise Cocciolone. II Tr. at 272, 295; Defs.' Ex. 10; Decl. of Berney, Ex. F.

## II. *Goals and Activities of the Birthright Organizations*

12. The Birthright movement comprises non-profit, charitable, interdenominational, and non-political organizations that provide emergency services to counsel women with crisis pregnancies. Based on the idea that every pregnant women has the right to give birth and every unborn child has the right to live, the Birthright movement encourages women with unplanned and/or unwanted pregnancies to bear their babies and not to have abortions. I Tr. at 31; Pl.'s Ex. 20 ("Decl. of Daughter Louise") ¶ 6.

13. Formulated in 1971, the Birthright Charter articulates the underlying philosophy and guiding principles of the Birthright movement.[2] I Tr. at 36–37; II Tr. at 131.

14. The Birthright Charter also provides the standards that govern the activities of the Birthright chapters. I Tr. at 36–37; Pl.'s Ex. 4 ("Decl. of Birthright Administration") ¶ 5; Pl.'s Ex. 65 ("Decl. of Weaver"), Ex. A.

15. The Declaration of Birthright Administration outlines the administrative structure of the Birthright movement and the relationship among the entities comprising it. I Tr. at 43.

16. Article I of the Birthright Charter states that:

The guiding principle of every Birthright Chapter shall be:

"It is the right of every pregnant woman to give birth, and the right of every child to be born."

Pl.'s Ex. 1; Defs.' Ex. 10.

17. The Birthright Charter states the following aims for all entities affiliated with the Birthright movement:

1. To uphold at all times, that every pregnant woman has the right to whatever help is needed to bring her child to term.

2. To attempt to effect in every possible way, a decrease in the number of abortions by encouraging pregnant girls and women to have their babies, that is, to offer them the alternative to abortion.

3. To maintain a crisis centre where any pregnant girl or woman, wed or unwed, may find help as near as her telephone.

4. To create and maintain in society an awareness of the needs of pregnant girls and women, to remove the social stigma associated with the unwed mother and her child and to encourage a more humane understanding of her and her problems.

Pl.'s Ex. 1; Defs.' Ex. 10.

18. The Birthright Charter articulates the following policies, to which all entities affiliated with the Birthright movement must adhere:

1. To refrain, at all times, and in every situation from giving aid to induced abortion, directly or indirectly.

2. To refrain in every instance from offering or giving advice on the subjects of contraception or sterilization, and to refrain from referring any person to another person, place or agency for this type of advice.

3. To remain strictly and completely separate from all lobbying groups, and from activities affecting abortion legislation.

4. To remain strictly inter-denominational, in name, function and advertising.

---

1. The court rejects plaintiff's contention that Birthright of Woodbury was never granted · a Birthright charter.

2. The parties are in dispute as to what document constitutes the true Birthright Charter. *Compare* Pl.'s Ex. 1 *with* Defs.' Ex. 10. The court, after examining both documents, finds that this dis-

pute need not be resolved because the differences between the two documents are irrelevant to the disposition of this case. All references to the Birthright Charter in these Findings of Fact and Conclusions of Law will be only to provisions that are contained in both documents.

5. To give help without charge for normal Birthright services.

6. To refer all matters concerning adoption and adoption procedures to legally authorized agencies.

7. To offer person to person help, giving love, understanding, and all needed moral, emotional and practical support to every pregnant woman who requests it, employing the use of non-professional workers. Birthright does not function solely as a referral agency although use is made of the professional service agencies.

8. To keep all services strictly confidential refusing to discuss any girl's problems with any person or agency without her consent, and to preserve her anonymity if she so desires.

9. To use the official and registered symbol, the stylized "B", on all official Birthright stationary and documents and when possible, in all advertising.

Pl.'s Ex. 1; Defs.' Ex. 10.

19. To supplement and clarify the Birthright Charter, the Birthright Board has the exclusive authority to issue policy directives. These policy directives are "as important as any of the terms of the Charter," and all entities and individuals connected to the Birthright movement are required to follow them. I Tr. at 40–42; II Tr. at 186–87; Pl.'s Ex. 8 ("The Birthright Charter and Policy Directives: Additional Comments").

20. One of the purposes of the Birthright Charter and the policy directives is to ensure that the Birthright entities maintain a separate and distinct identity as providers of a pregnancy counselling service. In line with this goal, the Charter and the policy directives prohibit conduct and activities which the Birthright Board believes will undermine Birthright's distinctive identity. According to the Introduction to the policy directives:

Many of the activities that Birthright intentionally does not engage in are well meaning and desirable. However, in virtually all cases, these services are provided by other organizations. If Birthright engages in additional activities it will only detract from our main purpose. As indicated, it will also create confusion in the minds of those we are attempting to serve.

Pl.'s Ex. 3. As mother Louise stated: "'Birthright's' image must be uniform from coast to coast." *The Story of Birthright* at 23.

21. The *Life Guardian* is the official Birthright newsletter. Among its purposes is to publish the Birthright Board's policy directives, as well as explanations and clarifications of policy issues. I Tr. at 60.

22. In an editorial published in the *Life Guardian* in October 1979, Denise Cocciolone recognized the necessity for policy directives in a growing organization as well as the exclusive authority of the Birthright Board to issue such directives.

Birthright belongs to no one person. I believe that the larger we become, the more specific our guidelines must become, and there will naturally be more possibilities of deviation. The fact that [a Birthright chapter] received a charter under one mode of operation does not make it an absolute, meaning that those methods can never be changed. The governing Board of the parent organization [*i.e.*, the Birthright Board] obviously has the right and duty to direct in a manner that will benefit the whole of the organization.

Pl.'s Ex. 57 ("Supp.Decl. of Daughter Louise"), Ex. J.

23. A Birthright Board policy directive prohibits Birthright chapters from being associated with any political or religious organization. The reason for this prohibition is that:

The essential purpose of Birthright has always been to provide the greatest possible assistance to pregnant women and engaging in activities which are political, religious or judgmental can only create a reluctance on the part of pregnant women to use Birthright services.

Pl.'s Ex. 3; *see also The Story of Birthright* at 22.

24. A further Birthright Board policy directive states that:

Birthright centres may not use graphic pictures, slides or videos [of] abortion to

persuade women to have their babies. This is not our method. Ours is the way of love and compassion.

Pl.'s Ex. 3.

25. A further Birthright Board policy directive states that:

a) Birthright volunteers are not to get involved in the abortion controversy. We do not demonstrate, carry placard[s] or go on anti-abortion marches or "sit-ins". This includes Operation Rescue. It is important always to maintain our identity as a service. Any public display will do harm to our public image and abortion-minded women might not then come to Birthright. . . .

b) It is important that we have a good relationship with other pro-life groups but we must be separate in that we are not to speak on the same platform or share booths at fairs. It is difficult enough to maintain our own identity.

Pl.'s Ex. 3. As explained by mother Louise:

Birthright, being an entirely new type of service should be careful not to be identified as a "lobbying group," working for further changes in abortion legislation. I honestly think that this would weaken the influence with the girls we hope to help, and will alienate many in the community.

*The Story of Birthright* at 21.

26. A further Birthright Board policy directive states that:

a) Under no circumstance must Birthright centres affiliate with other organizations or services. There is often pressure put on centres to join other pro-life groups but we must remain separate. We must maintain our own identity. You do not need to affiliate. . . .

b) There are many other pregnancy services although Birthright in Toronto was the first in the world. Many do not operate as we do. Some evangelize, some give contraceptive counselling, some deceive by pretending to offer abortion referrals, and some are into adoptions. Birthright's reputation could

be harmed if we are linked to any of these by affiliation.

Pl.'s Ex. 3.

27. The Birthright movement, through its chapters in North America, provides the following services to pregnant women in order to achieve its goal of counselling women with unexpected pregnancies to bear their babies and not to have abortions:

a. pregnancy tests;

b. educational services, such as home tutoring or night school;

c. medical and hospital assistance;

d. maternity and infant clothing and layettes;

e. employment advice;

f. referrals for professional counseling for marriage, family and financial problems;

g. referrals to licensed adoption agencies;

h. emergency and long-term accommodation through "shelter" homes;

i. pre- and post-natal classes on fetal development, childbirth, and childcare.

Decl. of Daughter Louise ¶ 10.

28. The Birthright chapters offer these services to any girl or woman who finds herself with an unplanned or unexpected pregnancy. II Tr. at 129. They also provide counselling services to the family and boyfriend of a woman with an unexpected pregnancy. II Tr. at 74–75.

29. The Birthright chapters typically provide these services free-of-charge, whenever financially feasible. Decl. of Daughter Louise ¶ 11.

30. The Birthright chapters support their activities through donations from private individuals and some churches. II Tr. at 128; Decl. of Daughter Louise ¶ 12.

31. Birthright, Birthright Inc., and the Birthright chapters regularly advertise and publicize services in local newspapers, telephone directory books, and other publications and media. These entities regularly use the "Birthright" name and the "B" logo is these advertisements. II Tr. at 128–29; Decl. of Daughter Louise ¶ 20 & Ex. C.

32. In 1985, the Birthright movement, through Birthright Inc., established and be-

gan to operate a crisis hotline by means of a toll-free 1–800 telephone number available from 8:00 am until midnight throughout the United States and its territories. Birthright Inc. also operates a toll-free crisis hotline telephone service for Canada. II Tr. at 233–33. The hotline got its start when a New Jersey businessman donated $100,000 for a Birthright advertisement in *Reader's Digest* on the condition that a 1–800 telephone hotline be installed. The same man donated $25,000 as seed money for the hotline and for the first fundraising mailing. II Tr. at 233–34. Hotline operators provide a source for immediate help to callers. The operators counsel callers and refer them to a local Birthright center. II Tr. at 237–39.

33. To pay for the hotline's operation, Birthright Inc. raises funds by means of a national direct mailing campaign to individuals and organizations throughout the United States. II Tr. at 232.

34. The hotline fundraising letters are sent to prior Birthright donors and volunteers, to Birthright chapters, and to individuals on lists compiled by a fundraising consultant. The lists are obtained by renting lists from organizations, magazines, or other entities that the fundraising consultant believes will be sympathetic to the Birthright movement. II Tr. at 146–47, 241, 269. These hotline fundraising letters are mailed on letterhead that uses the "Birthright" name and the "B" logo. Decl. of Daughter Louise ¶ 29 & Ex. E.

35. None of the money raised by means of the hotline fundraising letters and telephone solicitations is ever used to pay for the activities of the Birthright chapters. Rather, this money goes solely to defray the costs of operating the hotline. II Tr. at 245.

36. It is estimated that the fundraising letters for the crisis hotline raise approximately $600,000 per year. II Tr. at 244.

### III. *Organizational History and Structure*

37. Mother Louise established Birthright in Toronto, Canada on October 15, 1968 in order to provide a counselling service for pregnant women that would aid and assist them to carry their pregnancies to term and not to have abortions. *The Story of Birthright* at 8.

38. Birthright operated initially in Toronto as an unincorporated association under the direction and leadership of mother Louise. I Tr. at 44. It was incorporated as an Ontario corporation in February 1969. *See supra* Findings of Fact ¶ 3.

39. Mother Louise introduced the Birthright idea into the United States through speaking engagements and by meeting with individuals who were interested in providing crisis pregnancy services. For example, Terry Weaver heard mother Louise speaking at a pro-life meeting in the Chicago area in July 1969, and was inspired to establish the first Birthright center in the United States in Atlanta, Georgia, in October 1969. II Tr. at 85–86; Decl. of Weaver ¶ 3; Decl. of Daughter Louise ¶ 15.

40. By 1971, a "Directory of Birthright Groups" identified 43 entities operating in 21 states and the District of Columbia. Aff. of Cocciolone, Ex. J.

41. On August 15, 1971, mother Louise convoked a meeting of all people involved in Birthright. At this time, the language for the Birthright Charter was drafted and finalized by mother Louise and a group of 15–18 other people. II Tr. at 131, 224–25.

42. Throughout the 1970s and 1980s, the Birthright movement continued to grow, with more Birthright chapters and more pregnant women obtaining counselling services. Today, there are approximately 600 Birthright chapters worldwide and almost 500 chapters in the United States. Decl. of Daughter Louise ¶ 8.

43. Toward the end of the 1980s, the Birthright movement addressed the issue of who would assume leadership upon the death of mother Louise. At the 1989 Birthright International Convention held in Toronto, mother Louise announced that her daughters would take over her role as head of Birthright upon her death or when she was no longer physically capable of carrying out her duties. Although some individuals questioned, or may even have opposed, this decision, it was in fact implemented upon mother

Louise's death in 1991. Pl.'s Ex. 17; Decl. of Berney ¶ 14; Aff. of Sanders ¶¶ 7–8.

44. Throughout its history, the Birthright movement has as a general rule operated through an informal and decentralized organizational structure. According to mother Louise, this organizational model was better suited to attract volunteers and encourage spiritual people to open new centers. In addition, mother Louise believed that a formal, centralized organization would create internal lobbying for power among members and volunteers. *The Story of Birthright* at 18, 41–42, 95–96, 118; Aff. of Cocciolone ¶¶ 14, 15.

45. Despite this generally informal and decentralized structure, authority over critical aspects of the Birthright movement, including over monitoring the use of the name and logo, lay in the hands of plaintiff Birthright. *See infra* Findings of Fact ¶¶ 69–74.

46. Today, the Birthright movement is comprised of local chapters, regional consultants, regional representatives, regional directors, a U.S. national office, Birthright Inc., and an international office located in Toronto, Canada. I Tr. at 32–34; *see infra* Findings of Fact ¶¶ 47–74.[3]

A. Local Birthright Chapters

47. Birthright provides its services to pregnant women primarily through local Birthright chapters. There are currently approximately 500 Birthright chapters in the United States. Decl. of Daughter Louise ¶ 8. Defendant Woodbury Birthright is one such local chapter.

48. Birthright chapters are formed by local volunteers who understand and concur in the goals and philosophy of Birthright. I Tr. at 54, 61.

49. To become a Birthright chapter, a group of people must apply to plaintiff Birthright for a charter. Defs.' Ex. 5 (Handbook for Birthright at 4); Decl. of Birthright Administration ¶ 7. Generally, Birthright receives an inquiry as to the formation of a chapter directly or through a regional consultant. Plaintiff then sends out information, including a copy of the charter. The Birthright Board then reviews the application and, if it is in order, issues a charter. I Tr. at 54–56.

50. The Birthright Board has the sole authority to grant charters for the establishment of a local Birthright chapter. The Board issues charters only to entities that share the Birthright philosophy. The Birthright Board also has the exclusive authority to terminate the charter of a local chapter. Included in this authority to grant and revoke charters is the authority to grant and terminate a local chapter's authorization to use the "Birthright" name and the "B" logo. I Tr. at 61; II Tr. at 275; Decl. of Birthright Administration ¶¶ 7, 8.

B. Regional Consultants

51. Above the local chapters are the regional consultants. The position of regional consultant was formed in 1972 in order to help increase Birthright's activities in the United States. Decl. of Weaver ¶ 16; II Tr. at 157.

52. Regional consultants are appointed upon the joint consultation of Birthright and the U.S. National Director. II Tr. at 15, 275.

53. Regional consultants help in the development and organization of new Birthright centers, and they are available to existing centers for help and advice in dealing with problems. Defs.' Ex. 19; II Tr. at 157.

54. In 1980, mother Louise, in her capacity as president of Birthright, and Denise Cocciolone, in her capacity as U.S. National Director, developed the Regional Consultants Guidelines, which outlined a set of principles and policies to aid Regional Consultants in their tasks. Defs.' Ex. 19; II Tr. at 223–24.

---

**3.** The court rejects defendants' contention that the diagram contained in defendants' exhibit 17 represents an accurate portrayal of the organizational structure among the Birthright entities. It apparently represents the opinion of a consultant as to the Birthright's organizational structure. II Tr. at 156, 182–83. There is no evidence as to the material relied upon by this consultant, and the consultant did not appear as a witness in the present matter. Accordingly, the court discounts defendants' exhibit 17 and relies upon its own review of the record to determine the Birthright organizational structure.

C. Regional Representatives

55. In June 1989, Birthright and Birthright Inc. established the position of Regional Representative to serve as a channel of communication between the Regional Consultants and the management of the Birthright movement. This position is presently inoperative. II Tr. at 159–60.

D. U.S. National Director, the U.S. National Office, and Birthright Inc.

56. Above the regional directors is the national office. In Canada, the plaintiff Birthright constitutes the national office. In the United States, various individuals and organizations have comprised the national office throughout the history of the Birthright movement.

57. The U.S. national office is run by a national director responsible to plaintiff Birthright. The purpose of the U.S. national office is to serve the Birthright chapters located in the United States and to help the chapters to follow the directives and policies set forth by plaintiff. The national office and the national director are appointed and may be terminated by plaintiff Birthright. II Tr. at 88, 91; Pl.'s Ex. 70; Defs.' Ex. 3; Aff. of Cocciolone, Ex. D.

58. The first U.S. National Director was Lore Maier. Mother Louise appointed Maier to "[a]ct as a co-ordinator of Birthright operation in the United States of America in the capacity of the National Director of the United States of America, only being responsible to the International Committees, the Birthright Board and the Founder of Birthright." The location of the national office during Maier's tenure as National Director was in Toledo, Ohio. Defs.' Ex. 3.

59. In September 1971, mother Louise, acting in her capacity as an officer of Birthright, terminated the appointment of Maier as National Director. II Tr. at 132–33, 284–85.

60. Upon Maier's termination, Birthright appointed Denise Cocciolone to the position of U.S. National Director. On September 18, 1971, plaintiff changed the address of the U.S. national office from Toledo, Ohio to Woodbury, New Jersey. Defs.' Ex. 3.

61. Defendant Birthright Inc. was established approximately nine months after the appointment of Cocciolone to the position of national director and the relocation of the national office to Woodbury. Defs.' Ex. 1; Defs.' Ex. 3; II Tr. at 82, 220–21.

62. Birthright Inc. was formed to operate as the national office for Birthright. II Tr. at 13. Birthright Inc., however, does not itself comprise the national office for the Birthright movement.

63. Neither Denise Cocciolone, as U.S. National Director, nor Birthright Inc., as the U.S. national office, was ever granted exclusive control over the operations, activities, or organizations of the Birthright movement in the United States.

64. Cocciolone acted as U.S. National Director until approximately May 1987. On or about May 5, 1987, plaintiff Birthright appointed Cocciolone and Weaver to serve as national co-directors. In an announcement, the Birthright Board defined the duties of Cocciolone as comprising fundraising for Birthright Inc. and for the hotline service. The Board directed Weaver to help and to guide the chapters and consultants in the United States. Pl.'s Ex. 71.

65. On or about July 8, 1987, plaintiff informed Weaver that her services as national co-director were no longer needed, and she stepped down from that position and resumed her duties as a regional consultant. II Tr. at 91–92. Cocciolone once again functioned as the sole U.S. National Director.

66. On April 24, 1991, plaintiff dismissed Cocciolone from her position as National Director. Pl.'s Ex. 18.

67. Thereafter, plaintiff appointed Terry Weaver to the position of National Director in the United States, and the national office was moved to Atlanta, Georgia. II Tr. at 24, 26–27, 92.

E. The Toronto Office

68. The international headquarters and parent organization of the Birthright movement is plaintiff Birthright, located in Toronto, Canada. *See* Decl. of Berney, Exs. C, D; Pl.'s Ex. 70.

69. Plaintiff Birthright has the sole power to issue and to revoke the charters of local Birthright chapters. *See supra* Findings of Fact ¶ 50.

70. Plaintiff shared with Birthright Inc. the power to hire and terminate regional consultants. II Tr. at 152, 175.

71. Plaintiff has the sole power to hire and terminate the national director in the United States. Denise Cocciolone defined Birthright's authority in this regard in a letter she wrote on September 27, 1971:

> We are aware, however, that an appointed National Director of any organization or corporation is responsible to the Board of Directors and must confine himself to carrying out those responsibilities delegated to him by the Executive Board. If any Executive Director deviates from policy, defaults his responsibilities, or oversteps his authority, the Board is obligated to review what has happened and take prompt, positive action.

Pl.'s Ex. 60.

72. Plaintiff has the sole power to interpret the Birthright Charter. II Tr. at 279.

73. Plaintiff has the sole power to formulate, implement, and enforce policy directives that articulate the Birthright movement's philosophy. *See supra* Findings of Fact ¶ 19. For example, in 1983, the Birthright Board decided to forbid the use of the Pearson abortion slides. The Board then enforced this policy as against a Birthright Chapter located in New Haven, Connecticut. Supp. Decl. of Daughter Louise, Ex. P; Pl.'s Ex. 10.

74. Plaintiff has the sole power and responsibility to monitor the use of the "Birthright" name and the "B" logo, including the authority to revoke the charter of any Birthright chapter that violated the Birthright philosophy and to bring lawsuit against any entity that illegally used the name and/or logo. *See infra* Findings of Fact ¶¶ 87–92.

IV. *The "Birthright" Name and the "B" Logo*

75. The Birthright entities use the "Birthright" name as a service mark to identify the kind of pregnancy counselling servic-es they offer. The Birthright entities frequently modify the name by adding a word or phrase, often identifying a geographic location, that further identifies the entity. For example, defendant Birthright Inc. uses the name "Birthright USA;" plaintiff Birthright uses the name "Toronto Birthright" or "Birthright International." However, these modified marks share the same core, *i.e.* the word "Birthright," and are therefore substantially the same.

76. The "Birthright" name appears on fundraising letters mailed throughout the United States and is therefore used in interstate commerce. Decl. of Daughter Louise, Ex. E.

77. The Birthright entities also use the "B" logo as a service mark to identify the kind of pregnancy counselling services they offer. *The Story of Birthright* at 18.

78. The "B" logo appears on fundraising letters mailed throughout the United States and is therefore used in interstate commerce. Decl. of Daughter Louise, Ex. E.

A. History of the Name and Logo

79. On August 16, 1971, plaintiff registered with the United States Patent Office, as registration no. 940,150, the "Birthright" name as a service mark for the counseling of pregnant women. Pl.'s Ex. 7B. In the late 1970s, plaintiff allowed registration No. 940,150 to lapse. I Tr. at 27.

80. On July 27, 1982, plaintiff registered with the United States Patent and Trademark Office, as registration no. 1,203,140, the "Birthright" name as a service mark for the counseling of pregnant women. Pl.'s Ex. 7. Plaintiff has also filed declarations with the United States Patent and Trademark Office pursuant to Sections 8 and 15 of the Lanham Act. I Tr. at 25–26.

81. On March 21, 1975, plaintiff registered with the Canadian Department of Consumer and Corporate Affairs, as registration no. 205,989, the "Birthright" name as a trademark. Pl.'s Ex. 7A. On January 12, 1990, plaintiff obtained from the Canadian Department of Consumer and Corporate Affairs a certificate of renewal for registration

no. 205,989, renewing the trademark registration for a period of fifteen years. Pl.'s Ex. 7A.

82. The "B" logo was designed in 1968 for mother Louise to use as a symbol for the Birthright movement and the services it offers. *The Story of Birthright* at 18–19.

83. Since 1968, plaintiff Birthright and its licensed U.S. organizations, have publicized the "Birthright" name and the "B" logo throughout the United States as symbols for the kind of pregnancy counselling service offered by the Birthright entities. The name and logo represent the assets of a valuable reputation and good will associated with Birthright. Decl. of Daughter Louise ¶¶ 20, 21, 24 & Exs. C, D.

84. Despite plaintiff's registration of the "Birthright" name as a trademark in Canada and the United States, plaintiff, mother Louise, and others connected to the Birthright movement have represented that the "Birthright" name and the "B" logo are owned by mother Louise and/or copyrighted in the name of mother Louise. *See* Decl. of Birthright Administration ¶ 4.

85. Plaintiff and others have also represented the status of the "Birthright" name as a registered trademark in Canada and the United States. Decl. of Weaver, Ex. A; Aff. of Cocciolone, Ex. I. For example, in a speech given to the Birthright International Convention in June 1983 and subsequently published in the *Life Guardian,* Gordon Kaiser, Esq., a trademark attorney who sat on the Birthright Board, stated:

> The trademark 'Birthright' is owned by Birthright, the Canadian corporation, and that is true of all the trademark registrations around the world. Birthright licences each chapter to use that mark. And as you know, each chapter is required to fill out and sign a charter—there is an application and attached to that application is a charter. One section of that charter deals with the trademark. That charter is, among other things, a trademark licence. Birthright therefore has an obligation to ensure that anyone using the name Birthright lives up to the terms of that charter or licence. If they don't, Birthright has an obligation at law to REQUIRE those people to cease using the name 'Birthright'. And of course, the "B" logo, which is also a protected symbol.

Second Supp.Decl. of Daughter Louise, Ex. B; II Tr. at 230.

86. Throughout the period relevant to this litigation, Denise Cocciolone—and therefore both Birthright Inc. and Woodbury Birthright—knew of the status of the "Birthright" name as plaintiff's registered trademark and knew that the "B" logo was owned and controlled by plaintiff. II Tr. at 278.

### B. Birthright's Monitoring Activities

87. Plaintiff Birthright has the responsibility and authority to monitor the use of the "Birthright" name and the "B" logo. I Tr. at 6, 13; II Tr. at 187; Pl.'s Exs. 10, 12, 21, 23; Defs.' Exs. 7d, 7f.

88. Denise Cocciolone—and therefore both Birthright Inc. and Woodbury Birthright—knew of and acknowledged the fact of plaintiff Birthright's role and authority in monitoring the name and logo. II Tr. at 187, 278; Supp.Decl. of Daughter Louise, Ex. I.

89. Plaintiff has the authority to revoke a charter and terminate a local chapter's use of the "Birthright" name and the "B" logo where the local chapter is not in compliance with the Birthright Charter or policy directives. An example of Birthright's monitoring of the name and logo occurred in 1990, when the San Diego chapter was not operating in conformity with the Birthright Charter and policy directives. In a letter dated October 1, 1990, the Birthright Board stated that it would revoke the San Diego chapter's charter, thereby terminating the latter's right to use the name and logo, "if immediate action is not taken to resolve the problems." Pl.'s Ex. 11. Daughter Louise travelled to San Diego to try to resolve the matter, but when the San Diego chapter failed to take steps to bring itself sufficiently in compliance with the charter, it voluntarily changed its name. II Tr. at 8–10.

90. One of the grounds on which plaintiff may revoke the charter of a Birthright chapter is for performing overtly political activities and/or adopting overtly political posi-

tions. For example, in 1983, plaintiff enforced its decision to forbid the use of the Pearson abortion slides. In a letter dated April 12, 1983, the Birthright Board informed the director of a Birthright Chapter located in New Haven, Connecticut that Birthright

> maintain[s] the right to guarantee the beliefs and philosophy of Birthright. Should you decide to use [the Pearson] slides in your office, in opposition to the decision of the Board of Directors, we will have no choice but to insist, legally if needed, that you stop using the name of Birthright.

Pl.'s Ex. 10. As a result of this correspondence, the New Haven Chapter came into compliance, ended its use of the slides, and was permitted to continue its use of the "Birthright" name. II Tr. at 10–11.

91. As part of its monitoring responsibilities, plaintiff may threaten or take legal action against entities using the "Birthright" name without plaintiff's permission. For example, in 1977, plaintiff retained counsel and sued such an organization in Indiana using the "Birthright" name, forcing it to change its name to "Birthline, Inc. of St. Joseph County." II Tr. at 6–7; Pl.'s Ex. 12.

92. Another example of Birthright's monitoring of the name and logo occurred in 1990, when Denise Cocciolone, acting on behalf of Birthright Inc., signed a contract with Christianson, Barkley and Shaw ("CBS"), pursuant to which CBS represented itself as Birthright's exclusive representative for placing advertisements in Yellow Pages telephone directories. In connection with this contract, Cocciolone permitted CBS to use the "Birthright" name and the "B" logo. Cocciolone did this without any authorization from Birthright. II Tr. at 254–56, 292–93. In response to this situation, plaintiff sent a letter to CBS on June 28, 1990, stating that the representation that CBS is the "exclusive" agent for Birthright advertising in Yellow Page directories is false, and that CBS is not authorized to use the Birthright mark and the "B" logo. Plaintiff demanded that CBS cease this activity immediately, and informed CBS that the principal Birthright office is located in Toronto, not Woodbury. Aff. of Cocciolone, Ex. I.

## V. *The Dispute Between Birthright and Birthright Inc.*

### A. The Controversy Over the Fundraising Letters

93. The dispute between plaintiff and defendant Birthright Inc. centers around the tone and content of the fundraising letters sent out by Birthright Inc. as part of its direct mail fundraising efforts for the telephone hotline. II Tr. at 281.

94. Beginning in 1990, plaintiff perceived the following problems in the fundraising letters:

i. that the letters had taken on a changed tone, emphasizing political aspects of the abortion controversy and deemphasizing the loving and non-judgment nature of Birthright;

ii. that the letters gave some Birthright donors the mistaken impression that their local Birthright centers, would receive a portion of any donation when in fact all the money went to support the telephone hotline;

iii. that some Birthright donors and volunteers resented receiving direct mail fundraising letters when they were already strong supporters of their local Birthright centers;

iv. that the mailings were followed up with high-pressure telephone calls.

Decl. of Daughter Louise ¶ 31. At a December 1, 1990 meeting of Regional Consultants, mother Louise expressed her concern "that fundraising letters are giving Birthright a bad name." Supp.Decl. of Weaver, Ex. A.

95. In comparison with the letters after 1990, the fundraising letters from the period 1986–1990 place greater emphasis on the activities of the Birthright organizations and the need to obtain funding to support these activities rather than on explicit references to political aspect of the abortion controversy. Decl. of Daughter Louise, Ex. E.

96. Beginning in 1990, the tone of the fundraising letters did in fact change in comparison with the pre–1990 letters. After 1990, the number of positive statements contained in each fundraising letter and on each page of the fundraising letter became signifi-

cantly smaller. *See* Pl.'s Proposed Findings of Fact, Exs. A, B. In addition, after 1990, the fundraising letters contained an increased number of references to political aspects of the abortion controversy. When read as a whole, these letters advanced a more political, strident tone in comparison with the pre–1990 letters. Decl. of Daughter Louise, Ex. E.

97. Plaintiff Birthright has determined that the post–1990 letters are political in tone and that they, therefore, are in violation of the Birthright Charter and policy directives. Decl. of Daughter Louise ¶¶ 32–35.

98. The fundraising letters were also misleading to the average reader because they suggested that donations made in response to the letters would fund the activities of a local Birthright center when, in fact, all donations were used to support the operation of the telephone hotline. For example, a March 29, 1991 letter informs the potential donor that "Birthright relies on these contributions to fund all our baby-saving programs." Decl. of Daughter Louise, Ex. E.

99. Another letter, dated "Monday Afternoon," and apparently mailed to potential donors sometime in 1992, states: "Birthright has never been a money making organization. We depend solely on the charity of our members for financial support." Decl. of Daughter Louise, Ex. E. These statements mislead the potential donor into believing that his or her donation will be used to support *all* of the programs and services offered by the Birthright entities rather than just the hotline.

100. Birthright received complaints about the fundraising letters from local Birthright donors, Birthright volunteers, a member of the Atlanta board of directors, a clergyman, and a Georgia state senator. II Tr. at 20, 95–98; Decl. of Weaver ¶ 22. For example, Georgia State Senator Joe Burton wrote to Terry Weaver:

The author of this mailing identifies herself as *the* National Executive Director. Do the receipts from this solicitation go directly to the leadership of Birthright in the USA and Canada? Are the receipts shared with each local chapter? On what basis are they divided? Is there an accounting or audit of this solicitation?

He further wrote:

In the 17th paragraph, the letter states that donated funds will be used to open new birthright centers. Is this being done with the funds from this solicitation?

Decl. of Weaver, Ex. B. Terry Weaver also received complaints that the fundraising letters were taking away money from the local Atlanta center and that their tone was not in keeping with the gentle, loving character of Birthright. II Tr. at 96, 98.

101. There is no evidence that prospective donors received high-pressure follow up phone calls.

102. As a result of the problems with the fundraising letters, Mother Louise requested that her name be removed from at least one fundraising letter sent out by Birthright Inc. II Tr. at 281; Decl. of Daughter Louise, Ex. E.

103. At a December 1990 meeting of Birthright regional consultants held in Woodbury, New Jersey, a discussion took place regarding the problem of the direct mail fundraising letters sent by Birthright Inc. The Regional Consultants expressed their concern that the letters had hurt their fundraising efforts, were too political in spirit and tone, and did not reflect Birthright's positive, gentle, and loving approach. II Tr. at 20–21; Decl. of Weaver ¶¶ 21–22; Supp.Decl. of Weaver, Ex. A; *see also* Decl. of Houseal ¶¶ 17–18; Decl. of Farley ¶¶ 17–18.

104. Thereafter, the Birthright Board discussed the problem of the direct mail letters, and directed that each letter be reviewed and approved by Birthright before it was sent out by Birthright Inc. II Tr. at 21. These directions were conveyed to Birthright Inc., and Denise Cocciolone knew of these instructions. II Tr. at 21, 281. Despite these directions, Birthright Inc. continued to send out direct mail fundraising letters without Birthright's prior review and approval. II Tr. at 21–22, 281.

105. In February 1991, the Birthright Board met with Denise Cocciolone and the direct mail fundraisers for Birthright Inc. to discuss the problem of the letters. At this

meeting, the Board expressed its concerns about the letters, and explained what it found offensive and how it thought the language could be softened to take on a more positive tone. As a result of this meeting, the Board believed that Birthright and Birthright Inc. had reached an understanding on the letters. II Tr. at 22–23.

106. After the February 1991 meeting, Birthright Inc. sent out a fundraising letter asking recipients to sign a 1991 Sustaining Membership Card. Birthright considered this letter to be in violation of the guidelines established at the February 1991 meeting. Pl.'s Ex. 67; Decl. of Daughter Louise ¶ 35.

### B. Dismissal of Cocciolone From the Position of National Director

107. Because of the ongoing controversy over the fundraising letters sent out by Birthright Inc., mother Louise, acting on behalf of plaintiff Birthright, dismissed Denise Cocciolone from the position of national director in the United States on April 24, 1991. On September 25, 1991, the Birthright Board, at a meeting which Cocciolone attended, affirmed this dismissal. Pl.'s Ex. 17; Pl.'s Ex. 18; II Tr. at 287.

108. Cocciolone was dismissed because her actions contravened the Declaration of Birthright Administration incorporated into the Birthright Charter and because of her failure as national director to follow the directives of the Birthright Board. Pl.'s Ex. 18; II Tr. at 76.

109. After her dismissal from the position of national director in September 1991, Cocciolone continued to hold herself out to be U.S. National Director. She sent out letters in the name of Birthright, signing them under the title of "National Director." These letters bore the "Birthright" name and the "B" logo. Supp.Decl. of Daughter Louise, Ex. M; II Tr. at 24, 282–83.

110. On January 15, 1992, Denise Cocciolone was removed from the Birthright Board. Pl.'s Ex. 18; II Tr. at 287.

111. By letter dated January 16, 1992, Cocciolone was informed that on January 15, 1992, the Birthright Board had removed her from that body. II Tr. at 25, 287; Pl.'s Ex. 54.

112. In a letter dated May 8, 1992 to directors of Birthright centers, the board of directors of Birthright Inc., including Denise Cocciolone, represented that Cocciolone continued to occupy the position of "National Director." Supp.Decl. of Daughter Louise, Ex. O.

### C. Revocation of Birthright Inc.'s Authorization to Use the "Birthright" Name and the "B" Logo

113. On January 15, 1992, the Birthright Board terminated the authorization for Birthright Inc. to use the "Birthright" name and the "B" logo. The reasons for this action were the Birthright Inc. board of director's defiance of plaintiff's policy directives and Birthright Inc.'s refusal to accept Denise Cocciolone's dismissal from the position of U.S. National Director. Pl.'s Ex. 18; II Tr. at 28–30.

114. Birthright Inc., through Denise Cocciolone, received notice of the termination of its authorization to use the "Birthright" name and the "B" logo. II Tr. at 65–66, 287; Pl.'s Ex. 54.

### D. Birthright Inc.'s Continued Use of the Mark and Logo

115. After the termination of its authorization to use the "Birthright" name and the "B" logo on January 15, 1992, and despite its knowledge of such termination, Birthright Inc. continued to use the name and logo. II Tr. at 287.

116. After the termination of it authorization to use the name and logo on January 15, 1992, and despite its knowledge of such termination, Birthright Inc. continued to collect donations sent to it as a result of its fundraising letters. Decl. of Holly ¶ 4a.

117. On or about January 21, 1992, Denise Cocciolone sent a letter addressed "MY Dear BIRTHRIGHT People," which states:

> Our BIRTHRIGHT Inc. U.S.A. Board of Directors wishes you to know that nothing has changed here in the last 21 years, except growth and experience. We are

still operating just as we have always done and will continue to be of service to you.

We regret any confusion or misinterpretation that may have occurred in conversation between Mr. McCullough and Louise R. However, BIRTHRIGHT U.S.A. does intend to continue its commitment to serve women and girls and help save preborn lives as we have always done.

The letterhead contained the "Birthright" name. Supp.Decl. of Daughter Louise Ex. M.

118. After the commencement of the present litigation, the board of directors of Birthright Inc. sent a letter dated May 8, 1992, addressed "Dear BIRTHRIGHT Director." The letter advised the recipient of the pending litigation, and stated that Birthright Inc. "was willing to make painful concession to resolve the situation, thus avoiding costly litigation." The letter further stated that

Among the demands that we cannot accept, is the condition which required BIRTHRIGHT Inc., U.S.A. to make no use of the established 800 number. That would mean, based on the figures of March, 1992 alone, every month an average of 4500 women and babies helped by the HOTLINE would be at risk.

The letter further stated that:

As stated in past correspondence, the Board of BIRTHRIGHT Inc., U.S.A. and Denise Cocciolone, in her position as National Director, reaffirm our commitment to the Charter Document and BIRTHRIGHT's "main purpose ... to offer the alternative to abortion".

Since BIRTHRIGHT Inc., U.S.A.'s funds are committed to the HOTLINE and Advertising thereof, a separate Legal Defense Fund has been established. We are confident that you, our U.S. Chapters, will help us in defense of BIRTHRIGHT and our quest for justice.

The letterhead contained the "Birthright" name and the "B" logo. Supp.Decl. of Daughter Louise Ex. O.

119. On or about May 11, 1992, Des Burge, chairman of Birthright Board, wrote a letter addressed "Dear Birthright Di-

rector," in response to the May 8th letter to clarify the dispute between Birthright and the "Woodbury group." The letter stated:

Although the Woodbury group is clearly committed to offering an alternative to abortion, we are concerned about the spirit and philosophy under which they operate. Our particular concern arises from the direct mail fundraising letters which are sent from Woodbury.... The tone and spirit of this letter is clearly not in keeping with the gentle and loving nature of Birthright.

The letter further stated that the "Woodbury group" does not believe that Birthright has the authority to oversee the fundraising operations and that the Woodbury group has continued to send such letters without any notice to or input from Birthright. In addition, the letter stated:

The Woodbury group has stated that it is prepared to change the name under which it operates, but has indicated that it will take up to 1 year to do so. As well, we have been told that the other conditions we sought are not open to discussion or negotiation. We are unable to allow this situation to continue for another year, and believe that it is in everyone's best interests to negotiate other terms.

For your information, Birthright International has absolutely no intention of shutting down the Hotline. We believe that all Hotline calls must be answered, and asked the Woodbury group to cease use of the current number so that Birthright calls would continue to be received by Birthright people. It is our intention to simply move the Hotline, without any interruption of service. We certainly have no objection to the Woodbury group establishing its own hotline in providing its services and operating as a separate organization with its own identity.

This letter also contained an attached copy of the complaint filed in this litigation. Supp. Decl. of Daughter Louise, Ex. N.

VI. *The Dispute Between Birthright and Woodbury Birthright*

120. On January 15, 1992, the Birthright Board revoked the charter of Woodbury Birthright. Pl.'s Ex. 18. The reason for

revoking the charter of Woodbury Birthright was that Woodbury Birthright was controlled by Denise Cocciolone. II Tr. at 30. This revocation meant that Woodbury Birthright's authorization to use the name and logo was also terminated. Woodbury Birthright, through Denise Cocciolone, received notice of the termination of its authorization to use the "Birthright" name and the "B" logo. Pl.'s Ex. 54; II Tr. at 65–66.

## VII. *"Campaign Life"*

121. Beginning as early as 1985, Denise Cocciolone sent out fundraising letters under the name "Campaign Life." The funds raised by these letters were used for the Birthright hotline service. Cocciolone recently sent out a fundraising letter under the rubric of Campaign Life that does not mention Birthright. II Tr. at 299, 301.

122. On April 29, 1992, Denise Cocciolone and Mrs. Cook established a bank account in the name of Campaign Life. This account was initially funded with $25,000 of donation raised by Birthright Inc. for the Birthright hotline service. II Tr. at 299.

123. Cocciolone recently registered Campaign Life as an alternative name for Birthright Inc. II Tr. at 299.

## Conclusions of Law

### I. *Jurisdiction and Venue*

1. This court has diversity, trademark, and supplemental jurisdiction over the claims in this action pursuant to 28 U.S.C. §§ 1332, 1338, and 1367. *Nugget Distrib. Co-Op v. Mr. Nugget, Inc.*, 776 F.Supp. 1012, 1024–25 (E.D.Pa.1991). Venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391, because the defendants are doing business within this district. *Id.*

### II. *Plaintiff's Claims*

2. The law of trade and service mark protection, as embodied in the federal Lanham Act and the common law of unfair competition, advances two related goals. First, it serves the general interest of the public by protecting consumers from false and misleading representations concerning the source, identity, or quality of a product or service. Secondly, the law protects the right of the owner of a trade or service mark to have his or her product or service identified by a distinct name or label. *See Industrial Rayon Corp. v. Dutchess Underwear Corp.*, 92 F.2d 33, 35 (2d Cir.1937), *cert. denied*, 303 U.S. 640, 58 S.Ct. 610, 82 L.Ed. 1100 (1938). In other words, the trademark laws exist not only "to protect the consuming public from confusion" but also to protect the trade or service mark owner's "right to a non-confused public." *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1228 (3d Cir.1978) (quoting *James Burrough Ltd. v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 276 (7th Cir.1976)); *see also Weil Ceramics and Glass, Inc. v. Dash*, 878 F.2d 659, 672 (3d Cir.), *cert. denied*, 493 U.S. 853, 110 S.Ct. 156, 107 L.Ed.2d 114 (1989); *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 304 (3d Cir.1986).

3. The "Birthright" name and the "B" logo are service marks. A service mark is "a word, name, symbol, device or advertising of services to identify the service of the entity and distinguish them from the services of others." *Estate of Presley v. Russen*, 513 F.Supp. 1339, 1362 (D.N.J.1981). The service identified by the name and logo is the unique kind of pregnancy counselling offered by the Birthright entities.

### A. Count I: Trademark Infringement Claim Under the Lanham Act

4. Plaintiff's first claim is for trademark infringement in violation of Section 32 of the Lanham Act. 15 U.S.C. § 1114(1).[4] Because

---

4. Section 32 provides in relevant part:
   (1) Any person who shall, without the consent of the registrant—
   (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with ... services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, ... to labels, signs, prints, packages, ... upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

Section 32, by its terms, applies only to registered marks, this claim concerns only defendants' use of the registered "Birthright" name.

■■■ 5. To succeed on a trademark infringement claim under Section 32, a plaintiff must establish three elements:

i. that the mark is valid and legally protectable;

ii. that the mark is owned by the plaintiff;

iii. that the defendant's use of the mark to identify goods or services is likely to create confusion concerning the origin of the goods or services.

*S & R Corp. v. Jiffy Lube Int'l, Inc.,* 968 F.2d 371, 375 (3d Cir.1992); *Opticians Ass'n v. Independent Opticians of Am.,* 920 F.2d 187, 192 (3d Cir.1990). In addition, in a case like the one at bar, where defendants' previous use of the mark occurred with plaintiff's permission, plaintiff must also establish that a defendant's use of the mark is unauthorized. *S & R Corp.,* 968 F.2d at 375; *United States Jaycees v. Philadelphia Jaycees,* 639 F.2d 134, 137 (3d Cir.1981).

### 1. Validity, Ownership, and Protectability of the Mark

■■■ 6. The first and second elements of plaintiff's Section 32 infringement claim—the validity, ownership, and protectability of the mark—may be proven by a showing that the mark at issue was federally registered and had become "incontestable" under the Lanham Act. *Opticians Ass'n v. Independent Opticians of Am.,* 920 F.2d 187, 194 (3d Cir.1990); *see also Ford Motor Co. v. Summit Motor Prod., Inc.,* 930 F.2d 277, 291 (3d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991). In the present case, plaintiff's ownership and control of the "Birthright" name are established by virtue of Birthright's registration of the mark in 1982 with the United Stags Patent and Trademark Office. Plaintiff's confirmation of its registration in 1989, pursuant to Sections 8 and 15 of the Lanham Act, made plaintiff's registration incontestable. 15 U.S.C.

§§ 1058, 1065; *Opticians Ass'n,* 920 F.2d at 192. Under Section 33(b) of the Lanham Act:

To the extent that the right to use the registered mark has become incontestable, . . . the registration shall be conclusive evidence of . . . the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce.

15 U.S.C. § 1115(b). Defendants do not dispute that plaintiff's registration of the "Birthright" name as a trademark has attained an incontestable status under the Lanham Act.

### 2. Unauthorized Use

■ 7. A third element for proving a Section 32 infringement claim under the facts of this case is that the defendants' use of the mark was unauthorized. Defendants' use of the "Birthright" name was pursuant to licenses, implied or otherwise, so that once plaintiff revoked these licenses, defendants' continued use of the mark became unauthorized.

■ 8. The court first addresses whether defendant Birthright Inc. used the name pursuant to an implied license with plaintiff. An implied license in fact "arises out of the objective conduct of the parties, which a reasonable man would regard as indicating that an agreement has been reached." *Allen–Myland v. International Business Mach. Corp.,* 746 F.Supp. 520, 549 (E.D.Pa.1990). The case of *United States Jaycees v. Philadelphia Jaycees,* 639 F.2d 134 (3d Cir.1981), which involved a trademark infringement claim brought by the national Jaycees organization against the Philadelphia Jaycees chapter, illustrates the application of this rule. There, the national organization, having revoked the charter of the Philadelphia chapter because it admitted women, sought an injunction barring the latter from using the "Jaycees" name. *Id.* at 136–37. The district court found as fact that a local chapter affiliated with the United States Jaycees was authorized to use the name "Jaycees"

shall be liable in a civil action by the registrant.

15 U.S.C. § 1114(1).

only during the term of the affiliation. The Third Circuit concluded from these facts that "some type of license agreement existed" between the Philadelphia chapter and the national Jaycees organization. *Id.* at 139 n. 7.

9. The analysis in *United States Jaycees* controls this case. It has been found as fact that plaintiff monitored and controlled the use of the "Birthright" name. *See supra* Findings of Fact ¶ 74. It has further been determined that Birthright Inc. used the mark subject to the authorization and control of plaintiff, and that both parties understood this arrangement. *See supra* Findings of Fact ¶¶ 85–88. It is irrelevant that here, unlike in *United States Jaycees,* Birthright Inc. was not a local chapter with a charter issued by the parent organization. What is critical is that Birthright Inc. knew which entity owned the mark; that Birthright Inc. knew that plaintiff monitored and controlled the use of the mark; and that Birthright Inc. knew that authorized use of the mark required the permission of plaintiff. Given these facts, the court concludes, as a matter of law, that the relationship between plaintiff and Birthright Inc. amounted to an implied license authorizing the latter to use the name.

10. An implied license is terminable at will. *Coach House Restaurant, Inc. v. Coach & Six Restaurant, Inc.,* 934 F.2d 1551, 1563 (11th Cir.1991). In the present case, plaintiff (the licensor) terminated the implied licensing agreement with Birthright Inc. (the licensee) when on January 15, 1992 it ended defendants' authorization to use the name.

11. As to Woodbury Birthright, the Charter granted by plaintiff constituted a license for the use of the "Birthright" name. Findings of Fact ¶ 50. Thus, once plaintiff revoked its charter, Woodbury Birthright's continued use of the mark was unauthorized.

### 3. Likelihood of Confusion

12. The final element of plaintiff's infringement claim concerns whether defendants' use of the "Birthright" name creates a likelihood of confusion. A likelihood of confusion exists "when consumers viewing the mark would probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1229 (3d Cir.1978).

13. The parties' use of the "Birthright" name generally occurs with a geographic modifier. *See supra* Findings of Fact ¶ 75. Plaintiff often identifies itself as "Birthright International," "Birthright of Toronto," or "Birthright of Canada." Defendants identify themselves as "Birthright Inc. U.S.A." or as "Birthright of Woodbury." Despite these differing uses, when the parties' use the name "Birthright," with or without a geographic modifier, they are using essentially the same mark because the word "Birthright" constitutes the dominant portion of the mark. *Country Floors, Inc. v. Partnership of Gepner and Ford,* 930 F.2d 1056, 1065 (3d Cir.1991); *United States Jaycees v. Philadelphia Jaycees,* 639 F.2d 134, 142 (3d Cir.1981); *see also Foxtrap, Inc. v. Foxtrap, Inc.,* 671 F.2d 636, 640–41 (D.C.Cir.1982); *Council of Better Business Bureaus, Inc. v. Better Business Bureau of South Florida, Inc.,* 200 U.S.P.Q. 282, 298 (S.D.Fla.1978); *United States Jaycees v. San Francisco Junior Chamber of Commerce,* 354 F.Supp. 61, 77 (N.D.Cal.1972), *aff'd,* 513 F.2d 1226 (9th Cir. 1975).

14. "[I]f the overall impression created by marks is essentially the same, 'it is very probable that the marks are confusingly similar.'" *Opticians Ass'n of America v. Independent Opticians of Am.,* 920 F.2d 187, 195 (3d Cir.1990) (quoting McCarthy, *Trademarks and Unfair Competition* § 23:7 (2d ed. 1984)). In determining the overall impression given by the service mark at issue in this case, the court notes that the "consumers" or targets of the "Birthright" name fall into two categories. First are the women and girls who may desire counsel and assistance on how to address an unexpected pregnancy. *See supra* Findings of Fact ¶¶ 27–28. These individuals, who may use the hotline or may turn to the local chapters, become aware of the Birthright entities' services through advertisements, mailings, or word of mouth. The second category of "consumers" are the

individuals who contribute or provide money, services, and other types of support to the Birthright entities, whether to the local Birthright chapters or to Birthright Inc. to support the hotline telephone number. *See supra* Findings of Fact ¶¶ 30–34. These individuals, who make donations in order to support the pregnancy counselling services, become aware of the Birthright entities' activities in this regard through participation in Birthright activities, direct mailings, telephone solicitations, or word-of-mouth. From the perspective of the two categories of "consumers," the mark used by plaintiff is virtually identical to the marks used by defendants. An individual from either category of "consumers" could not discern any differences between plaintiff and defendants just by looking at the mark.

15. Under controlling law, the determination that defendants' service marks are virtually identical to plaintiff's suffices to support a conclusion of a likelihood of confusion. *See S & R Corp. v. Jiffy Lube Int'l, Inc.,* 968 F.2d 371, 375 (3d Cir.1992). As the Third Circuit has noted, "there is a great likelihood of confusion when an infringer uses the exact trademark." *Jaycees,* 639 F.2d at 142; *see also Ford Motor Co. v. Summit Motor Prod.,* 930 F.2d 277, 293 (3d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991); *see also Opticians Ass'n,* 920 F.2d at 195 (quoting 2 *McCarthy on Trademarks* § 23:3) ("Cases where a defendant uses an identical mark on competitive goods hardly ever find their way into the appellate reports. Such cases are 'open and shut' and do not involve protracted litigation to determine liability for trademark infringement."). Accordingly, the court holds that there is a likelihood of confusion.

16. Plaintiff has satisfied the elements necessary to succeed on a Section 32 trademark infringement claim. Accordingly, the court will enter judgment in plaintiff's favor on this claim, unless defendants are able to establish an affirmative defense.

**B. *Count II: Unfair Competition Claim Under the Lanham Act***

17. Plaintiff's second claim is that defendants violated Section 43(a)(1)(A) of the Lanham Act by continuing to use the "Birthright" name and the "B" logo subsequent to the termination of their licenses. 15 U.S.C. § 1125(a)(1)(A).[5] The elements for an unfair competition claim under Section 43(a)(1)(A) of the Lanham Act are "(1) that the trademark or trade name is distinctive and therefore, protectable; and (2) that the second comer's actions cause a likelihood of confusion among the relevant consumers." *Dominion Bankshares Corp. v. Devon Holding Co., Inc.,* 690 F.Supp. 338, 344 (E.D.Pa.1988). In addition to furnishing a further source of protection for registered marks, Section 43(a)(1)(A) also protects unregistered service marks, such as the "B" logo. *See Two Pesos, Inc. v. Taco Cabana, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992).

18. As to defendants' use of the "Birthright" name, it is clear from the above Conclusions of Law with regard to the infringement claim that plaintiff has satisfied both elements of a Section 43(a)(1)(B) unfair competition claim. Indeed, the courts have held that "[s]ince trademark infringement is a narrower concept, any finding that it has occurred will, by necessity, support an additional finding that the defendant is also guilty of unfair competition." *Nugget Distrib. Co-op v. Mr. Nugget, Inc.,* 776 F.Supp. 1012, 1024 (E.D.Pa.1991) (quoting *Smithkline Beckman Corp. v. Pennex Products Co.,* 605 F.Supp. 746, 749 (E.D.Pa.1985)). The "Birthright" name is registered and incontestable, and thus deserving of trademark

---

**5.** Section 43(a)(1)(A) of the Lanham Act provides, in relevant part:

(a)(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, ... which—
(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ...

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
15 U.S.C. § 1125(a)(1)(A).

protection. Further, defendants' use of the name was unauthorized and causes a likelihood of confusion among the two groups of "consumers" of Birthright services—pregnant woman and contributors.

19. As to defendants' use of the unregistered "B" logo, plaintiff has also satisfied the elements for a Section 43(a)(1)(A) unfair competition claim. First, the facts support the conclusion that plaintiff is the owner and senior user of the "B" logo. Findings of Fact ¶ 82–83.

20. Second, the "B" logo is a unique and distinctive service mark deserving of legal protection. It is well established that "the more distinctive, unique and well-known the mark, the deeper is the impression it creates upon the public's consciousness and the greater the scope of protection to which it is entitled." I *McCarthy on Trademarks and Unfair Competition* § 11.-24[1], at 11–126 (3d ed. 1992). The Third Circuit recognizes four categories by which a mark's inherent distinctiveness may be measured:

   i. Arbitrary (or fanciful) terms, which bear no logical or suggestive relation to the actual characteristics of the goods;

   ii. Suggestive terms, which suggest rather than describe the characteristics of the goods;

   iii. Descriptive terms, which describe a characteristic or ingredient of the article to which it refers; and

   iv. Generic terms, which function as the common descriptive name of a product class.

*A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 296 (3d Cir.1986); *see also Berner Int'l Corp. v. Mars Sales Co.*, 987 F.2d 975, 979 (3d Cir.1993). Arbitrary and suggestive terms exhibit the greatest amount of inherent distinctiveness, and will generally "automatically qualif[y] for trademark protection at least in those geographic and product areas in which the senior user applies it to its goods." *A.J. Canfield*, 808 F.2d at 297. A descriptive term features little or no inherent distinctiveness, and is entitled to trademark protection only upon a showing that the term

has taken on a "secondary" meaning among consumers identifying the term with the claimant. *Id.* Finally, a generic term "is never protectable because even complete 'success ... in securing public identification ... cannot deprive competing manufacturers of the product of the right to call an article by its name.'" *Id.* (quoting *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976)).

21. In the present case, the "B" logo is not completely arbitrary because the inherent meaning of the symbol gives the consumer an idea that the services provided by the organization are connected to matters involving telephones and fetuses. The logo, however, also cannot be categorized as descriptive because it is not capable of conveying to a consumer the specific notions that the particular service being provided is pregnancy counselling, that the philosophy of the organization is to encourage birth and to prevent abortions, or that the counselling must be given in a loving, non-confrontational manner that avoid religious and political issues. Accordingly, the "B" logo is a suggestive term, and it therefore qualifies under *A.J. Canfield* for trademark protection.

22. Defendants used the logo pursuant to licenses identical to the ones existing for the name "Birthright." Once plaintiff terminated these licenses, defendants' use of the logo became unauthorized. Finally, as with the "Birthright" name, defendants' unauthorized use of the "B" logo creates a clear likelihood of confusion for the two groups of Birthright "consumers."

23. Plaintiff has therefore satisfied its burden of showing a violation of Section 43(a)(1)(A) of the Lanham Act with respect to the "Birthright" name and the "B" logo. Accordingly, the court holds that judgment will entered in plaintiff Birthright's favor on its claim of unfair competition pursuant to Section 43(a)(1) of the Lanham Act, unless defendants are able to establish an affirmative defense.

C. *Count III: False and Misleading Statements Claim Under the Lanham Act*

24. Plaintiff's third claim under the Lanham Act is that Birthright Inc. made

false and misleading statements in violation of Section 43(a)(1)(B) of the Lanham Act. 15 U.S.C. § 1125(a)(2).[6] The theory of liability under Section 43(a)(1)(B) is commonly known as a false advertising claim. Although, strictly speaking, Birthright Inc.'s fundraising letters were not commercial advertisements, Section 43(a)(1)(B) is broad enough to support, in the context of non-profit fundraising, a claim of false and misleading statements about the services represented by a protected mark. This Section provides for liability for misrepresentations not only in commercial advertising but also in the "promotion" of services. The statements contained in fundraising letters about the services provided by a non-profit organization represent a promotion of those services.

■ 25. To succeed on a claim of false and misleading promotion under section 43(a)(1)(B) of the Lanham Act, plaintiff must prove the following elements:

   i.  that the defendant has made false or misleading statements as to his own product or the product of another;

   ii.  that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience;

   iii.  that the deception is material in that it is likely to influence purchasing decisions;

   iv.  that the advertised goods travelled in interstate commerce; and

   v.  that there is a likelihood of injury to the plaintiff in terms of declining sales, loss in goodwill, etc.

*U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia,* 898 F.2d 914, 922–23 (3d Cir.), *cert. denied,* 498 U.S. 816, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990); *see also Ditri v. Caldwell Banker Residential Affiliates, Inc.,* 954 F.2d 869, 872 (3d Cir.1992).

26. Plaintiff contends that the letters failed to properly notify a potential donor

that the money being raised goes only to support the hotline. As to elements (1) and (2), it has been found as facts that the fundraising letters in evidence that were sent out by Birthright Inc. contained misleading statements and had a tendency to deceive a recipient as to where donations would end up. Findings of Fact ¶ 98–99.

■ 27. In analyzing the third element of a Section 43(a)(1)(B) claim, the court must distinguish between letters received and contemplated by potential donors before and after January 15, 1992. The letters' tendency to deceive is not material for those letters received prior to January 15, 1992. Until the disaffiliation in January 1992, Birthright Inc. was part and parcel of the Birthright movement. The donations used to support the hotline service provided a means by which pregnant women could contact the local Birthright chapters. This fundraising directly aided in the goal of the local chapters to reach as many pregnant women as possible. Thus, even if some recipients of the letters were in fact deceived as to where the donations were going, this deception was not material to the decision of a potential donor on whether or not to support the Birthright movement.

28. However, after January 15, 1992, the impact of the misleading statements contained in the fundraising letters became material, because Birthright Inc. was no longer affiliated with the Birthright movement. After January 15, 1992, the fundraising letters confused or were likely to confuse a potential donor as to the use of a contribution to Birthright Inc., and this confusion was material in that the potential donor may not have wished to contribute to an entity no longer connected to the Birthright movement. Accordingly, plaintiff has satisfied the third element of its Section 43(a)(1)(B) claim.

**6.** Section 43(a)(1)(B) provides in relevant part:
   (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, ... which—
   (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qual-

ities, or geographic origin of his ... services, or commercial activities,

.   .   .   .   .

shall be liable in a civil action by any person who believe that he or she is or is likely to be damages by such act.
15 U.S.C. § 1125(a)(1)(B).

29. Plaintiff satisfies the fourth element of false and misleading statements claim by the fact that the fundraising letters travelled in interstate commerce. *See* Findings of Fact ¶ 33.

■ 30. Finally, plaintiff has shown that the post-January 1992 letters resulted or were likely to result in donors sending money to the disaffiliated Birthright Inc. who would otherwise only send donations to a Birthright entity.

31. Thus, the court holds that plaintiff has satisfied the elements for a claim of false or misleading statements, and judgment will be entered in plaintiff's favor, unless an affirmative defense is established.

### D. *Affirmative Defenses*

Defendants raise three equitable defenses to plaintiff's claims under the Lanham Act: abandonment, acquiescence, and laches.

#### 1. *Abandonment*

■ 32. Defendants argue that plaintiff's course of conduct with respect to Birthright Inc.'s use of the mark and the logo constitutes an abandonment of ownership. "Abandonment, being in the nature of a forfeiture, must be strictly proved." *United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 139 (3d Cir.1981). The Lanham Act provides two alternative methods for showing abandonment.[7] First, abandonment may be established by the owner's (1) nonuse of the mark combined with (2) an intent to abandon. 15 U.S.C. § 1127; *United States Jaycees*, 639 F.2d at 138; *BIEC Int'l, Inc. v. Global Steel Serv., Ltd.*, 791 F.Supp. 489, 533 (E.D.Pa.1992). Second, abandonment may also occur as a result of "any acts of commission or omission causing the marks at issue to lose their significance as indications of origins." *United States Jaycees*, 639

F.2d at 139 (interpreting 15 U.S.C. § 1127(b)).

■ 33. Defendants' abandonment defense must fail. As to the first definition of abandonment, defendants have not established plaintiff's non-use of the "Birthright" name and/or the "B" logo. "[A]bandonment occurs only when [a] registrant fails to use its mark anywhere in the nation." *Id.* (citing *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 363 (2d Cir.1959)). As the Third Circuit has stated, "[c]onsistent and proper use of [a] mark[ ] elsewhere in the United States ... defeats any claim of nonuse." *Id.* (citation omitted). Here, the record shows that plaintiff, on its own and through its chartered and licensed chapters and entities, used the name and the logo throughout the nation. In addition, the record fails to establish any intent to abandon on plaintiff's part. On the contrary, plaintiff has consistently monitored the name and the logo in an attempt to protect their identification with a particular kind of pregnancy counselling. Indeed, the present litigation represents a *strong* indication of plaintiff's intent to retain control over the mark and logo.

■ 34. Nor have defendants proven that plaintiff abandoned the mark and logo within the meaning of the second definition of abandonment. It is true that for over 20 years plaintiff knew of and allowed both Birthright Inc. and Woodbury Birthright to use the "Birthright" name and the "B" logo to signify the kind of pregnancy counselling services offered by them. However, as ruled above, such use occurred pursuant to licenses. And although "either naked licensing or licensing without reasonable control can work an abandonment," *see United States Jaycees*, 639 F.2d at 140, neither of these conditions exists in this case because defendants' use was subject to their compliance with the Birthright Charter and policy directives, as

---

7. Section 45 of the Lanham Act provides the following definition of "abandonment:"

A mark shall be deemed to be "abandoned"—
(a) When its use has been discontinued with intent not to resume. Intent not to resume may be inferred from the circumstances. Nonuse for two consecutive years shall be prima facie abandonment.

(b) When any course of conduct of the registrant, including acts of omission as well as commission, causes the mark to lose its significance as an indication of origin.
15 U.S.C. § 1127.

**1140**

monitored and controlled by the Birthright Board.

35. Indeed, it is precisely this circumstance that distinguishes the instant matter from those cases cited by defendants in which one entity has been found to have abandoned, acquiesced, or been barred by laches from asserting its rights over a mark vis-a-vis a competitor in a product market. *E.g. Anheuser–Busch v. DuBois Brewing Co.*, 175 F.2d 370 (3d Cir.1949), *cert. denied*, 339 U.S. 934, 70 S.Ct. 664, 94 L.Ed. 1353 (1950). In the case at bar, the parties were clearly not competitors. Rather, they belonged to a single movement composed of many entities which, however loosely organized, retained a structure of authority as to such matters as the monitoring and control of the "Birthright" name and the "B" logo. Indeed, as determined above, plaintiff and defendants stood in a licensing relationship as to the latter's use of the name and logo.

36. Accordingly, the court rejects defendants' affirmative defense of abandonment.

### 2. Acquiescence

37. A second defense raised by defendants is that plaintiff acquiesced in defendants' use of the "Birthright" name and the "B" logo. "The equitable defense of acquiescence ... 'constitutes a ground for denial of relief only upon a finding of conduct on the plaintiff's part that amounted to an assurance to the defendant, express or implied, that the plaintiff would not assert his trademark rights against the defendant." *Estate of Presley v. Russen*, 513 F.Supp. 1339, 1351 (D.N.J.1981) (citations omitted).

38. The facts of this case cannot support a defense of acquiescence. As determined above, the relationship of plaintiff to defendants Birthright Inc. and to Woodbury Birthright was one of a licensor to a licensee. Plaintiff authorized defendants to use the "Birthright" name and "B" logo so long as the defendants complied with the Birthright Charter and policy directives. Plaintiff possessed the authority to monitor and control defendants' use of the name and logo and to revoke their licenses if they failed to maintain compliance with the charter and policy directives. Given these facts, there can be no finding that plaintiff's conduct amounted to any kind of assurance that plaintiff would not assert its trademark rights in the name and logo as against the defendants. Accordingly, defendants' defense of acquiescence must be rejected.

### 3. Laches

39. Defendants third and final defense pursuant to the Lanham Act is laches. The defense of laches applies when, in light of all the existing facts and circumstances in a case: (1) plaintiff has inexcusably delayed in instituting suit and (2) this delay results in prejudice to the defendant. *University of Pittsburgh v. Champion Prod., Inc.*, 686 F.2d 1040, 1044 (3d Cir.), *cert. denied*, 459 U.S. 1087, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982); *Transfer Print Foils v. Transfer Print America, Inc.*, 720 F.Supp. 425, 440 (D.N.J.1989). However, even if proven, laches generally will bar a claim for an accounting for past infringement but not a claim for prospective injunctive relief. *University of Pittsburgh*, 686 F.2d at 1044.

40. Under the facts of this case, there was no inexcusable delay in instituting suit on the part of plaintiff. As determined above, plaintiff authorized defendants to use the "Birthright" name and the "B" logo pursuant to licenses, implied or express. Thus, plaintiff had no ground for bringing the present suit until January 15, 1992, when it revoked its authorization of defendants' use of the name and logo. Plaintiff then filed suit a little more than three months later, on April 24, 1992. A period of approximately three months cannot, under the circumstances of this case, be held to constitute delay of any kind, much less inexcusable delay. Moreover, even assuming, *arguendo*, the existence of inexcusable delay, there has been no showing of prejudice.

41. Accordingly, the court rejects defendants' third affirmative defense of laches.

### E. Count IV: Common Law Unfair Competition Claim

42. Plaintiff's final claim is for common law trademark infringement. It is well

established that the test for a common law unfair competition claim under New Jersey law is essentially the same as under the federal Lanham Act. *See SK & F Co. v. Premo Pharmaceutical Labs., Inc.*, 625 F.2d 1055, 1065–66 (3d Cir.1980); *Estate of Presley v. Russen*, 513 F.Supp. 1339, 1366, 1376 (D.N.J.1981). Accordingly, a separate analysis of plaintiff's common law claims is not required. The court holds that, for the same reasons defendants violated Section 43(a)(1)(A) of the Lanham Act, defendants are also guilty of common law unfair competition.

### F. Conclusion

43. Having determined that plaintiff has satisfied the necessary elements for its Lanham Act claims of trademark infringement, unfair competition, and false and misleading statements, as well as for its common law claim of unfair competition, and having determined that none of the equitable defenses raised by defendants as affirmative defenses apply, the court now holds that judgment will be entered in plaintiff's favor.

### III. Defendants' Counterclaims

Before turning to plaintiff's remedies for these trademark violations, the court addresses defendants' counterclaims of common law unfair competition, breach of contract, and defamation.

### A. Common Law Unfair Competition

■ 44. Defendants claim that plaintiff committed the common law tort of unfair competition by engaging in efforts to discredit Birthright Inc. and to dismiss its national director, Denise Cocciolone, as well as by publicizing these efforts. The court reads this claim to be one for disparagement of services provided by Birthright Inc. A necessary element of defendants' unfair competition counterclaim is that Birthright Inc. possessed ownership rights in the name and logo. However, as determined above, the ownership rights belong to Birthright. Accordingly, the court holds that defendants' unfair competition counterclaim must fail.

### B. Breach of Contract

■ 45. Defendants' second counterclaim is for breach of contract. Specifically, defendants contend that plaintiff committed a breach when it set up in Atlanta an alternative structure for the U.S. National Office to carry out the functions previously performed by Birthright Inc. According to defendants:

> For 20 years the two Birthright corporations [*i.e.* Birthright and Birthright Inc.] worked hand-in-hand, each performing discrete, complementary functions, in a course of conduct which portrays a mutual contractual agreement. Birthright [Inc.] invested substantially in expanded activities for the benefit of the plaintiff and its several hundred chapters, and performed all of its agreed functions effectively. This suit brought by the plaintiff, the attempt to erect an alternative structure in United States and the actions taken by the plaintiff to discredit Birthright [Inc.] and its national director are acts in breach of the contract, for which the plaintiff should be restrained from any further breach and be required to dismantle said alternative structure.

Defs.' Proposed Findings at 35.

46. It has already been determined that the contractual relationship between plaintiff and Birthright Inc. and plaintiff and Woodbury Birthright comprised an implied license, pursuant to which defendants were authorized to use the "Birthright" name and the "B" logo, while plaintiff retained the responsibility to monitor defendants' activities in order to ensure compliance with the Birthright Charter and the policy directives. On January 15, 1992, plaintiff, in accordance with its authority under the terms of the licensing agreements, revoked defendants' licenses to use the name and logo, in effect disaffiliating these organizations from the Birthright movement. The ground for revoking Birthright Inc.'s license was that it violated the Charter and the policy directives by engaging in political activities and that it refused to follow the orders of plaintiff in regard to the use of the mark and logo. Woodbury Birthright had its license revoked because plaintiff considered it to be, in effect, the same organization as Birthright Inc.

The court has determined that these reasons constituted good and valid grounds for plaintiff's termination of the licensing agreements with defendants. Accordingly, there was no breach of contract, and defendants' second counterclaim must fail.

## C. Defamation

■ 47. Defendants' final counterclaim is for defamation. Specifically, defendants contend that statements in the May 11, 1992 letter issued by plaintiff's board of directors were defamatory. Under New Jersey law, "[d]efamation imposes liability for publication of false statements that injure the reputation of another." *Printing Mart v. Sharp Elec.*, 116 N.J. 739, 765, 563 A.2d 31 (1989). Defendants' defamation counterclaim must fail because they have failed to carry their burden of proof to show by a preponderance of the evidence that the alleged defamatory statements in the May 11th letter are false.

48. Defendants first contend that the depictions of defendants in the May 11th letter as not being Birthright people, as not providing services in consonance with the Birthright spirit and philosophy, and as having violated the Birthright charter are false and defamatory. Defendants further claim that plaintiff's portrayal in the May 11th letter of Birthright "as having powers specifically accorded exclusively to defendant Birthright Inc. by the Certificate of Incorporation issued by the state of New Jersey and to said defendant's board of directors by that defendant's Bylaws" is false and defamatory. Defs.' Answer ¶ 34. These contentions, however, must be rejected because the court has concluded that none of these statements is false. By May 11, 1992, defendants, in fact, were no longer "Birthright people," having been in effect properly disaffiliated by the Birthright Board on January 15, 1992 for violating the Birthright Charter and policy directives.

49. A second alleged instance of defamation consists of the May 11th letter's attachment of the original complaint in the present litigation, which, defendants claim, contains legal inadequacies and deceptions. This theory, too, must fail because defendants have not proven that any of the statements in the complaint are false.

## IV. *Remedies*

Plaintiff seeks four forms of relief. Plaintiff asks for a permanent injunction prohibiting defendants from using the "Birthright" name and/or the "B" logo as service marks. Plaintiff also asks for an order requiring defendants to destroy any and all material that uses the "Birthright" name and/or the "B" logo. Plaintiff's third prayer for relief is for an accounting and "lost profits," that is for the return of all monies donated to defendants as a result of their unauthorized use of the "Birthright" name and the "B" logo. Finally, plaintiff seeks an award of attorneys' fees. The court addresses in turn each of these claims for relief.

### A. Prohibitory Injunction

■ 50. Section 34(a) of the Lanham Act grants the district court the "power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable." 15 U.S.C. § 1116(a). In this case, plaintiff seeks a permanent injunction barring defendants from using the "Birthright" name and the "B" logo as service marks. The court has already held that defendants have violated, and will continue to violate, the Lanham Act by the use of any mark that contains the word "Birthright" or the logo. As a predicate to this holding, the court found as a fact that defendants' use of the name and logo causes a strong likelihood of confusion among the "consumers" of Birthright's pregnancy counselling services. Put simply, a pregnant woman seeking advice or a potential donor will likely not be able to tell the difference between the services offered by plaintiff and those offered by defendants.

■ 51. The object of the Lanham Act is to protect the mark and the public. A permanent injunction in furtherance of these goals is justified where a likelihood of confusion arises from a defendant's use of a mark. *United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 142 (3d Cir.1981). In light of the facts of this case, the court holds that a permanent injunction fully and fairly

fulfills the Lanham Act's purposes. Accordingly, defendants Birthright Inc. and Woodbury Birthright are permanently enjoined from using the "Birthright" name and the "B" logo as service marks.

### B. Destruction of Property

■ 52. Section 36 of the Lanham Act allows the district court to order the destruction of infringing articles where a defendant's liability arises under Section 43(a).[8] 15 U.S.C. 1118. Plaintiff seeks an order requiring defendants to destroy any and all material of defendants that uses the "Birthright" name or the "B" logo as a service mark. The court, however, finds this remedy unnecessary given the issuance of an injunction prohibiting defendants from using any such material bearing the name or logo. *Neva, Inc. v. Christian Duplications Int'l, Inc.*, 743 F.Supp. 1533, 1549 (M.D.Fla.1990); *Bonanza Int'l, Inc. v. Double "B"*, 331 F.Supp. 694, 696 (D.Minn.1971). Because the prohibitory injunction suffices to protect plaintiff from future infringements or misleading statements, plaintiff's prayer for relief under Section 36 is denied.

### C. Lost Profits

53. As a third form of relief, plaintiff seeks an accounting and a return of all donations made to defendants as result of defendants' use of the "Birthright" name and the "B" logo since January 15, 1992, when plaintiff revoked defendant's authorization to use these marks. The court analyzes whether plaintiff is entitled to this remedy under the Lanham Act's provision for recovery of lost profits. 15 U.S.C. § 1117(a).

54. A trademark violation may give rise to the relief of an accounting for profits in three situations: "[1] if the 'defendant is unjustly enriched, [2] if the plaintiff sustained damages from the infringement, or [3] if an accounting is necessary to deter a willful infringer from doing so again.'" *Burndy Corp. v. Teledyne Indus., Inc.*, 748 F.2d 767, 772 (2d Cir.1984) (quoting *W.E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 664 (2d Cir. 1970)); *see also George Basch Co., Inc. v. Blue Coral, Inc.*, 968 F.2d 1532, 1537 (2d Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 510, 121 L.Ed.2d 445 (1992).

■ 55. In the present case, the relevant basis for recovery is the deterrence situation.[9] Under the deterrence theory:

> a court may ·award a defendant's profits solely upon a finding that the defendant fraudulently used the plaintiff's mark.... The rationale underlying this [theory] is not compensatory in nature, but rather seeks to protect the public at large. By awarding the profits of a bad faith infringer to the rightful owner of a mark, [the courts] promote the secondary effect of deterring public fraud regarding the source and quality of consumer goods and services.

*Id.* at 1539; *see also Burger King Corp. v. Mason*, 855 F.2d 779, 781 (11th Cir.1988). In the context of not-for-profit fundraising, an award of all donations made to a willfully infringing defendant emerges from the deterrence rationale for awarding lost profits. This remedy protects the mark by functioning as a deterrent to potential infringers seeking to take advantage of the good will and reputation of a non-profit organization by fundraising under its protected mark. Moreover, it advances the interests of the relevant consuming public by ensuring that contributions reach their likely intended target.

---

**8.** Section 36 provides in relevant part:

> In any action arising under this Chapter, in which a violation of any right of the registrant ... or a violation under § 43(a), shall have been established, the court may order that all labels, signs, prints, packages, wrappers, receptacles, and advertisements in the possession of the defendant, bearing the registered mark or ... the word, term, name, symbol, device ... or representation that is the subject of the violation, or any reproduction, counterfeit copy, or colorable imitation thereof, and all plates, molds, matrices, and other means of making the same, shall be delivered up and destroyed.

15 U.S.C. § 1118.

**9.** Recovery under an unjust enrichment or a damages theory requires a showing of actual consumer confusion, *George Basch Co.*, 968 F.2d at 1538, 1539. Such a finding has not been established here.

■ 56. Defendant Birthright Inc. continued to seek and to accept contributions using the "Birthright" name and the "B" logo even after its authorization to use the marks had ended. Plaintiff, the guardian and monitor of the mark, had determined that the nature and quality of defendant Birthright Inc.'s activities no longer satisfied the distinctive identity symbolized by the name and logo. Nevertheless, defendant Birthright Inc. knowingly and willfully drew upon the good will and reputation of the name and logo in its continued fundraising efforts. While plaintiff has not introduced evidence of actual confusion, it is nevertheless clear that Birthright Inc.'s actions deprived potential donors of the knowledge that plaintiff had revoked Birthright Inc.'s right to use the name and logo and the reasons for this revocation.

57. In light of these facts and circumstances, the court concludes that Birthright Inc. engaged in a willful and fraudulent course of conduct, thus justifying an award of "lost profits" based on a deterrence rationale. Accordingly, the court will enter an order requiring defendant Birthright Inc. to account for and turn over to plaintiff Birthright all monies received after January 15, 1992 as a result of its fundraising letters for the telephone hotline.[10]

### D. Attorneys' Fees

58. The final form of relief sought by plaintiff is attorneys' fees. Section 35(a) of the Lanham Act provides that "[t]he court in exceptional cases may award reasonable attorneys' fees to the prevailing party." 15 U.S.C. § 1117(a). The Third Circuit defines "exceptional cases" as those in which the defendants' acts are deliberate or willful. *Ferrero U.S.A., Inc. v. Ozak Trading, Inc.,* 952 F.2d 44, 47 (3d Cir.1991); *Standard Terry Mills, Inc. v. Shen Mfg. Co.,* 803 F.2d 778, 782 n. 7 (3d Cir.1986). Thus, "a district court must make a finding of culpable conduct on the part of the losing party, such as bad faith, fraud, malice, or knowing infringe-

---

**10.** The court notes that plaintiff requests an accounting and award of all monies received by Birthright Inc. from the fundraising letters. While plaintiff may be entitled to such relief under a different legal theory, it raises only

ment," before it may grant an award of attorney's fees. *Ferrero,* 952 F.2d at 47.

■ 59. In the present case, it has already been found as fact that defendants willfully and fraudulently continued to use the "Birthright" name and the "B" logo even after plaintiff revoked its authorization for such use, and that defendants made such use of the name and logo in order to take advantage of and benefit from the good will and reputation of these marks. *See infra* Findings of Fact ¶¶ 83, 115–16. These circumstances make this matter an "exceptional" case in which attorneys' fees may be awarded.

■ 60. The language of Section 35(a), however, is permissive. A district court "may," but is not required to award reasonable attorneys' fees, even if the matter before it is an exceptional case. *See Dieter v. B & H Indus., Inc.,* 880 F.2d 322, 329 (11th Cir.1989), *cert. denied,* 498 U.S. 950, 111 S.Ct. 369, 112 L.Ed.2d 332 (1990). The court, having considered the equities of the matter, and using its sound discretion, holds that the present case does not warrant an award of attorneys' fees. In particular, the court notes that the present matter involves a dispute between non-profit organizations within the same social movement for control of the movement's name and logo. Political and social concerns rather than profit motivated the principal individuals and entities. Where a defendant's trademark violation occurs in a non-profit, noncommercial context, the equities favor a denial of an award of attorneys' fees. *Kappa Sigma Fraternity v. Kappa Sigma Gamma Fraternity,* 659 F.Supp. 117, 118 (D.N.H.1987).

### Conclusion

For the foregoing reasons, judgment will be entered in favor of plaintiff Birthright and against defendants Birthright Inc. and Woodbury Birthright on plaintiff's trademark claims under the Lanham Act and the com-

---

trademark claims in the present action. Accordingly, the court must limit relief to damages flowing from an established violation of the trademark laws.

mon law. As a result of these violations, the court will permanently enjoin defendants from using the "Birthright" name or the "B" logo as service marks, and will order an accounting and return of lost profits, in the form of donations made to Birthright Inc. after January 15, 1992 as a result of its use of the name and logo. The court denies plaintiff's request for a destruction order and for an award of reasonable attorney's fees. Finally, the court enters a judgment of no cause for action on defendants' counterclaims.

An appropriate order will be entered.

### AMENDED ORDER (pursuant to order dated July 21, 1993)

This matter having come before the court on a consolidated hearing for a preliminary injunction and trial on the merits, pursuant to Federal Rule of Civil Procedure 65(a)(2);

The court having reviewed the submissions of the parties and the entire record of the case; and

The court having entered pursuant to Federal Rule of Civil Procedure 52(a) its findings of fact and conclusions of law in the Amended Opinion filed on this date;

IT IS on this 21st day of July 1993 hereby

ORDERED, ADJUDGED, and DECREED that judgment is entered in favor of plaintiff Birthright and against defendants Birthright Inc. and Birthright of Woodbury in that:

1. defendants Birthright Inc. and Birthright of Woodbury have engaged in conduct constituting trademark infringement, in violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114; and

2. defendants Birthright Inc. and Birthright of Woodbury have engaged in conduct constituting unfair competition, in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); and

3. defendants Birthright Inc. and Birthright of Woodbury have made false and misleading statements in violation of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. 1125(a)(1)(B); and

4. defendants Birthright Inc. and Birthright of Woodbury have engaged in conduct constituting unfair competition, in violation of New Jersey common law;

IT IS FURTHER ORDERED, ADJUDGED, and DECREED that as a result of the above violations plaintiff Birthright is entitled to the following remedies:

1. defendants Birthright Inc. and Birthright of Woodbury are permanently enjoined from using the "Birthright" name and/or the "B" logo as service marks; and

2. defendant Birthright Inc. shall account for and pay plaintiff Birthright all monies received by defendant Birthright Inc. after January 15, 1992 in response to any and all fundraising letters sent out under the "Birthright" name and/or the "B" logo and such accounting and payment shall occur no later than 30 days from the date of entry of this Amended Order; and

IT IS FURTHER ORDERED, ADJUDGED, and DECREED that judgment is entered in favor of plaintiff Birthright and against defendants Birthright Inc. and Birthright of Woodbury on all of defendants' counterclaim against plaintiff.

No costs.