**NOVELL, INC., a Delaware corporation, Plaintiff,**

v.

**NETWORK TRADE CENTER, INC., a Utah corporation, and Mark Bondiett, Defendants.**

**No. CIV. 2:95 CV 523G.**

United States District Court, D. Utah, Central Division.

Aug. 18, 1997.

---

Robert S. Clarke, Jeffrey J. Hunt, D. Craig Perry, Parr, Waddups, Brwon, Gee & Loveless, for Plaintiff.

Denver C. Snuffer, Timothy Miquel, Willardson, Nelson, Snuffer & Dahle, for Defendants.

## MEMORANDUM DECISION AND ORDER

J. THOMAS GREENE, District Judge.

This matter is before the court on cross motions for summary judgment and partial summary judgment as well as other motions which were argued at a hearing on March 7, 1997.[1] Plaintiff was represented by Matthew B. Durrant and Jeffrey J. Hunt and defendants were represented by Denver C. Snuffer and Timothy M. Willardson. The mo-

1. Before the Court were plaintiff's motion for partial summary judgment on claims one through four, defendants' motion for partial summary judgment as to liability on all claims, plaintiff's motion for summary judgment on defendants' counterclaims, plaintiff's motion for sanctions, and plaintiff's motion to strike an opposition memorandum, and for attorney's fees.

tions were submitted for decision and taken under advisement.

## FACTUAL BACKGROUND

Plaintiff Novell, Inc. ("Novell") is a developer, manufacturer, and distributor of computer software for use on microcomputers known as "personal computers." "NetWare" is one of Novell's computer software products. NetWare is a networking program designed to link separate computers together and allow the transfer of information between users. NetWare is marketed and sold in two forms; as an "original" product, and as an "upgrade" product which is substantially the same and equivalent to the "original" product. The "original" product is intended for the first time buyer of networking software. The "upgrade" product is restricted for use by either registered users of an older version of NetWare, or for the user of a competitor's qualifying networking software. The two forms of the program are identical in every respect except packaging and price. The "upgrade" is considerably less expensive.

Defendant Mark Bondiett ("Bondiett") is the sole shareholder, director, and officer of defendant Network Trade Center, Inc. ("NTC"). NTC operates as a software distributor which sells software programs, including NetWare, to purchasers who then use the software in business or otherwise.

NTC's original business practice was to purchase NetWare and older versions of other networking software in bulk, at low prices. Then, using the old software, NTC would order the "upgrade" version of the latest release of NetWare by filling out an upgrade form using qualifying information from the old software. Typically, the upgrade form was completed under Bondiett's name and purchased from an authorized distributor, or sometimes from Novell directly. Once received, the "upgrade" software would be sold to a purchaser at a profit, or placed in inventory to be sold later.

Beginning in 1995, NTC began advertising that it would sell older qualifying networking software to end-users and then help them order the latest "upgrade" release of Novell's NetWare. However, in June 1995, Novell announced that it would discontinue its competitive upgrade program for distributors, thus forcing end-users who wanted to purchase "upgrade" software to do so directly through Novell.

At all relevant times, plaintiff had valid federal trademark registrations for the terms "Novell" (No. 1,338,892) and "NetWare" (No. 1,328,271). Novell has continuously owned and used these trademarks without challenge for more than five years. Novell only authorizes use of its trademarks pursuant to written agreements. Authorized distributors, original equipment manufacturers, and certain resellers may receive written authorization from Novell to use its trademarks.

NTC and Bondiett have never applied for or received written authorization from Novell to use Novell's trademarks, nor is NTC authorized as a distributor of NetWare. Nevertheless, NTC has conducted and continues to conduct business throughout the United States and Mexico selling NetWare "upgrades" through direct mail and advertisements in national computer magazines. NTC's advertisements feature the "Novell" and "NetWare" trademarks and trade dress. NTC promotes the Novell software in its advertisements as being "New Retail" or as a "Special Novell Promotional Package ." End-users who have made purchases of Novell software as a result of NTC advertising have complained to NTC as well as to Novell about the confusion concerning the nature and extent of rights obtained in the purchase. Some end-users were led to believe that the software they had purchased was an "original" rather than an "upgrade" product. Others thought they were entitled to register their NetWare product with Novell. Some end-users believed that Novell had sponsored and approved the sale of NetWare through NTC.

In July 1994, Novell notified NTC, in writing, that its advertisements, promotions, marketing, and sales of NetWare "upgrades" violated Novell's rights and policies, and demanded that NTC immediately discontinue all such forms of advertisement. Notwithstanding such notice, NTC has continued to advertise the NetWare product. Novell has also received complaints from some of its

authorized distributors, reflecting perceived unfairness and dissatisfaction because of competition with NTC in sales of NetWare by NTC that consist of "upgrade" product represented to be "original" product and sold at prices below the authorized distributors' "original" product prices.

Novell asserts federal question claims against NTC and Bondiett for trademark infringement, unfair competition and false advertising, and copyright infringement. Count I of plaintiff's complaint states a claim of trademark infringement under Section 32(1)(a) of the Lanham Act, 15 U.S.C. § 1114(1)(a). Count II states a claim of unfair competition in violation of the Lanham Act Section 43(a)(1)(A), 15 U.S.C. § 1125(a)(1)(A) and false advertising in violation of the Lanham Act Section 43(a)(1)(B), 15 U.S.C. § 1125(a)(1)(B). Count III states a claim of copyright infringement in violation of the Copyright Act, 17 U.S.C. §§ 101, et seq. Plaintiff seeks injunctive relief, monetary relief, and attorney's fees and costs pursuant to the aforesaid federal claims. Pendent state claims and common law claims are also asserted.[2] Defendants have set forth several affirmative defenses and counterclaims.[3] Plaintiff's federal claims will be discussed seriatim.

## STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. *Wright v. Southwestern Bell*, 925 F.2d 1288, 1292 (10th Cir.1991). Rule 56(c) requires "the nonmoving party to go beyond the pleadings and by ... affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

## ANALYSIS

## I TRADEMARK INFRINGEMENT UNDER THE LANHAM ACT

The Lanham Act advances two related goals concerning trademarks. First, to serve the general interest of the public "by protecting consumers from false and misleading representations concerning the source, identity, or quality of a product or service"; second, to protect the right of the trademark owner to use the mark to identify a product with a distinct name or label. *Birthright v. Birthright Inc.*, 827 F.Supp. 1114, 1133 (D.N.J. 1993).

In order to establish a claim of trademark infringement under the Lanham Act, four elements must be established: (1) the mark is valid and legally protected; (2) the mark is owned by the plaintiff; (3) the defendant used the trademark in commerce without consent; and (4) defendant's use of the trademark will create the likelihood of confusion. *Universal Money Ctrs., Inc. v. AT & T Co.*, 22 F.3d 1527, 1529 (10th Cir.), *cert. denied*, 513 U.S. 1052, 115 S.Ct. 655, 130 L.Ed.2d 558 (1994); *Jordache Enterprises,*

---

2. Plaintiff asserts the following additional claims:
 a. Common law trademark infringement
 b. Unfair practices
 c. Deceptive trade practices
 d. Violation of upgrade license
 e. Interference with existing economic relations
 f. Interference with prospective economic advantage, and
 g. Unjust enrichment.
Because this Court rules dispositively under the federal claims asserted, the pendent claims are dismissed without prejudice.

3. NTC's counterclaims include:
 a. Unfair practices under the Utah code
 b. Tortious interference with business (also asserted by Bondiett)
 c. Defamation (also asserted by Bondiett)
 d. Anti-trust violations, and
 e. RICO violations.
NTC's federal counterclaims (d and e) are dismissed as untenable in view of the dispositive rulings by this Court on plaintiff's federal claims. Defendants' state law counterclaims (a-c) are dismissed without prejudice.

*Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1484 (10th Cir.1987).

Novell's trademark infringement claims will be discussed and measured by the four elements above set forth.

### A) *Validity, Protectability, and Ownership of the Trademark*

■ The first two elements of plaintiff's Lanham Act infringement claim may be established by showing that the mark is protected by federal registration and that it has become "incontestable." *Birthright*, 827 F.Supp. at 1134; *Opticians Ass'n v. Independent Opticians of Am.*, 920 F.2d 187, 194 (3d Cir.1990). Plaintiff's trademarks "Novell" and "NetWare" are registered with the United States Patent and Trademark Office. Federal registration of Novell's trademarks evidence ownership and control, and entitles Novell to the exclusive use of its marks in commerce. If the trademark is continuously used and unchallenged for five years, it becomes incontestable. 15 U.S.C. § 1115(b); *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 932 (4th Cir.1995).

Defendants admit that Novell's trademarks meet the requirements of ownership and incontestability under the Lanham Act.

### B) *Unauthorized Use of Trademarks in Commerce*

■ The third element of a trademark infringement claim under the Lanham Act requires proof that use of the marks is unauthorized. As will next be discussed, it is manifest from the record before this Court that the use of Novell's marks by defendant was unauthorized.

#### No Written Authorization

Novell's standard policy towards its trademarks is to authorize use only under written agreements. Authorized distributors, origi-

nal equipment manufacturers, and certain resellers with whom Novell deals may receive written authorization to use Novell's trademarks. There is no dispute by the parties that neither NTC nor Bondiett have written authorization to use the marks.

#### Unauthorized Advertising

■ Unauthorized use of another's registered trademarks in advertising constitutes trademark infringement. In this regard, the Fifth Circuit has declared that "[a]ffirmative misrepresentation, such as placing a plaintiff's trademark on the defendant's advertisements, is clearly a violation of section 1125(a)." *Matrix Essentials, Inc. v. Emporium Drug Mart, Inc.*, 988 F.2d 587, 593 (5th Cir.1993).

■ In this case, it is clear that NTC used both the "Novell" and "NetWare" marks in advertisements placed in national computer magazines, and in direct mail sent to potential customers. The actions of NTC went well beyond any permissible build up of inventory of the NetWare product.[4]

#### No Implied License or Authorization

■ Otherwise unauthorized use of the marks of another can be justified when an implied license comes into being. An implied license can arise from conduct of the parties from which the existence of an agreement could reasonably be inferred. In *Birthright*, an implied license authorizing the defendant to use plaintiff's mark and name was found to exist. 827 F.Supp. at 1134. Contrary to the facts in *Birthright*,[5] however, there was no prior affiliation between the parties in this case, and there was never any conduct from which authorization to use the marks could be implied. Also, in July 1994, Novell notified NTC in writing that the advertisements, promotions, and marketing of Novell's marks by NTC was unauthorized and that Novell demanded NTC to cease using the marks immediately. It is apparent from the letter written by Novell, as well as other evidence

---

4. An allegedly infringing party must do more than merely stock a trademark owner's products. *Matrix Essentials*, 988 F.2d at 593.

5. In *Birthright*, because of the conduct and prior affiliation between the parties, an implied license was easily inferred. However, the court found

that the defendant knew or should have known that the implied license was terminable at will, and that when the two parties separated the authorization would cease. B27 F.Supp. at 1134.

in the record, that no implied agreement authorizing NTC to use the marks in advertising came into being.

*Sale of Product as Distinguished from Unauthorized Use*

In *Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073, 1076 (9th Cir. 1995), the Ninth Circuit reasoned that "[w]hen a purchaser resells a trademarked article under the producer's trademark, and nothing more, there is no actionable misrepresentation under the statute." Under the weight of authority, however, courts have held that trademark infringement does exist as in this case when a defendant goes beyond reselling the product. *See, Stormor v. Johnson*, 587 F.Supp. 275, 279 (W.D.Mich.1984).[6] NTC argues that it has done nothing more than sell the "upgrade" software it acquired without altering the appearance of the box, and that there is nothing wrong with doing that. This Court finds, however, that in addition to reselling the software NTC used Novell's marks in its advertising, knowing that it was not authorized to do so.

C) *Likelihood of Confusion as a Result of Unauthorized Use*

 The fourth and final element is the likelihood of confusion. "[R]elief under the Lanham Act will be denied unless a plaintiff can show that the allegedly infringing party's use is likely to cause confusion." *GTE Corp. v. Williams*, 649 F.Supp. 164, 171 (D.Utah 1986). In *Universal Money Ctrs.*, various factors were identified by the Tenth Circuit as indicative of the likelihood of confusion. 22 F.3d at 1530–34. The factors so identified by the Tenth Circuit are not exhaustive, and every factor may not be relevant in a particular case. *Jordache Enterprises*, 828 F.2d at

1484. The factors set forth in *Universal Money Ctrs.* and regarded by this court as most applicable to this case[7] will now be discussed.

*Similarity of the Marks*

In the case at bar, we are not confronted with the situation of a party using a mark of its own which has a strong likeness to a registered trademark. Instead, this case concerns the use of plaintiff's exact marks in advertisements published by NTC. Accordingly, the marks used by NTC are identical to the marks published by Novell and its authorized distributors in the same magazines.

Defendants do not contest that Novell's marks have been so used in NTC's advertising. Defendants argue, however, that there is nothing wrong with the use of Novell's marks in advertisements so long as the marks point to the source of ownership. In support, NTC cites *Trail Chevrolet, Inc. v. General Motors Corp.*, 381 F.2d 353 (5th Cir.1967). In that case the defendant used the trademark "Chevrolet" in the name of its business, which was the business of repairing and selling used Chevrolets. The court allowed the use of the trademarks so long as purchasers were not deceived. *Id.* at 354. *Trail Chevrolet* is distinguishable from the case at hand. In this case, NTC is not sponsored or affiliated with Novell. Unlike *Trail Chevrolet*, where customers could reasonably infer that the purpose of the business was to sell used Chevrolets and/or to repair them, NTC sells "upgrade" software as "original" software, and advertises it as "original" software. The advertising, business practices of NTC, and the prices offered are suggestive of sponsorship, affiliation, and

---

**6.** In *Stormor v. Johnson*, 587 F.Supp. 275 (W.D.Mich.1984), a case cited in *Sebastian*, the unaffiliated defendants used plaintiff's trademarks to advertise genuine trademarked products. The court found that trademark infringement existed because "defendants ha[d] used plaintiff's trademarks in a manner ... likely to cause the public to believe that defendants [were] part of Stormor's authorized sales network." 587 F.Supp. at 279. *See also, Sebastian* 53 F.3d at 1076.

**7.** The following factors from *Universal Money Ctrs.* are particularly applicable to this case:
 1. the degree of similarity in appearance or suggestion between the allegedly infringing mark, and the designated trademark;
 2. the relation in use and manner of marketing between the goods or services marketed;
 3. the degree of care likely to be exercised by purchasers;
 4. the relative strength of the trademark; and
 5. whether there was any actual confusion.
22 F.3d 1527, 1530.

approval by Novell. This is deceptive and misleading.

*Similarity of Marketing and Advertising*

Novell and NTC are in a direct competitive relationship. The parties compete for the same customers within the same customer base. The likelihood of confusion is greatest when products are distributed through the same outlets. *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 941 (10th Cir.1983). Furthermore, the likelihood of confusion is proportionate to the similarity between the products or services being sold. *Universal Money Ctrs.*, 22 F.3d at 1532. Both parties, as well as Novell's authorized distributors, advertise in the same magazines and in similar publications. Purchasers are likely to be confused when they discover that NTC charges considerably less than any other NetWare distributor. Once the software is purchased from NTC, discovery by end-users that the product purchased is only an unregisterable "upgrade", not qualified for the same benefits as an "original" purchase, raises obvious questions of deception and misrepresentation, as well as confusion.

*Degree of Care Exercised by Purchaser*

The degree of care consumers use to choose the product in the marketplace is relevant to the likelihood of confusion inquiry. *Universal Money Ctrs.*, 22 F.3d at 1533. Consumers of networking software are likely to exercise a moderate to high degree of care when selecting a program to purchase, a fact which Novell acknowledges. This factor weighs against a finding of likelihood of confusion because a consumer who purchases with a high degree of care deliberates much more about the purchase and is therefore less likely to be confused. Accordingly, this factor would not support a finding that actual confusion occurred in this case. However, the presence of this factor would not necessarily preclude such a finding.

*Strength of the Mark*

■ "Strong" trademarks are characterized as marks which are unique and used only by their owners. *Universal Money Ctrs.*, 22 F.3d at 1533. "Weak" marks are often used by other parties and are often claimed to be unrestricted as to use. *Id.* In *Universal Money Ctrs.*, the controversy had to do with use of the word "Universal." Both parties had incorporated the word into their products and promotions. The court, while finding for the defendants, determined that the term was a common word used by a significant number of persons and entities, thus characterizing the mark as "weak". *Id.*

Presently, the marks "Novell" and "Net-Ware" are uniquely distinctive terms. Novell has clearly used its marks for a considerable amount of time. The word "Novell" has been transformed into a specific name and image that is unique in the business world. "NetWare" is the only networking software with that name, and that name too has obtained substantial recognition in the software market. This Court finds that Novell's trademarks should be considered as "strong" trademarks, thus enhancing Novell's claim to the right of exclusive control.

*Proof of Actual Confusion*

The final and most obvious tell-tale factor in the Tenth Circuit's "Likelihood of Confusion" test is evidence of actual confusion. "Actual confusion in the marketplace is often considered the best evidence of likelihood of confusion." *Universal Money Ctrs.*, 22 F.3d at 1534.

Novell has presented evidence that both parties have received complaints from end-users. In this regard, Novell points to examples of confusion concerning the nature and extent of rights obtained by purchasers from NTC, particularly where the software was sold as an "original" product versus an "upgrade". Additionally, Novell cites confusion among its authorized distributors who "played by the rules" and felt betrayed by Novell for perceived allowance of NTC to sell "upgrade" software as "original" software. It is apparent to the Court that actual confusion has occurred and that there is a likelihood of further confusion.

Based upon the foregoing, including consideration of all of the applicable factors and the totality of the record, this Court concludes that no genuine issue of material fact exists and that summary judgment in favor of plaintiff on the issue of trademark in-

fringement under the Lanham Act should be granted.

## II *UNFAIR COMPETITION AND FALSE ADVERTISING UNDER THE LANHAM ACT*

Novell's second claim for relief is that defendants engaged in unfair competition and false advertising. A party injured by a competitor's "false designation of origin" on its product is protected by Section 43(a)(1) of the Lanham Act, 15 U.S.C. § 1125(a)(1).[8] *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 516 (10th Cir.1987). Plaintiff points to unauthorized use by defendants of the "Novell" and "NetWare" trademarks in competition and advertising.

### A) *Unfair Competition*

 Plaintiff's claim of unfair competition is made pursuant to Section 43(a)(1)(A) of the Lanham Act [9]. A claim of unfair competition may be asserted pursuant to that statute if: (1) the trademark in question is distinctive and protectable; and (2) the defendants' actions cause a likelihood of confusion among consumers in the marketplace. *Birthright*, 827 F.Supp. at 1136.

 It is clear from the previous discussion regarding infringement that Novell has satisfied both elements of a Section 43(a)(1)(A) unfair competition claim. Courts have held that trademark infringement is a narrower concept than unfair competition. Accordingly, a finding of trademark infringement necessarily supports an additional finding that the defendant is guilty of unfair competition. *Birthright*, 827 F.Supp. at 1137. It follows, based upon undisputed facts in this record, that plaintiff has satisfied the burden of showing a violation of Section 43(a)(1)(A) of the Lanham Act with respect to the "Novell" and "NetWare" marks, and that summary judgment for the plaintiff on the issue of unfair competition should be granted.

### B) *False Advertising*

 Plaintiff's claim of false advertising is made pursuant to Section 43(a)(1)(B) of the Lanham Act [10]. Generally, false advertising claims are actionable under the Lanham Act if they are affirmatively misleading, partially incorrect, or false because they fail to disclose material facts. *U.S. Healthcare, Inc. v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 921 (3d Cir.), *cert. denied*, 498 U.S. 816, 111 S.Ct. 58, 112 L.Ed.2d 33 (1990). To establish a claim of false advertising, a plaintiff must prove: (1) the defendant has made false or misleading statements as to his own product or the product of another; (2) there is actual deception or at least a tendency to deceive a substantial portion of the intended audience; (3) the deception is material in that it is likely to influence purchasing decisions; (4) the advertised goods traveled

---

**8.** Section 43(a)(1) of the Lanham Act is divided into two subsections: (A) unfair competition; and (B) false advertising. Plaintiff asserts violations of both of these subsections in the second claim for relief.

**9.** This section provides, in relevant part:
(1) Any person who, or in connection with any goods or services, ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, ... [or] false or misleading description of fact, or false or misleading representation of fact, which –
(A) is likely to cause confusion, ... as to the affiliation, connection, or association of such person with another person, ... sponsorship, or approval of his or her goods, ... or commercial activities by another person,
\* \* \* \* \* \*
shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
15 U.S.C. § 1125(a)(1)(A).

**10.** This section provides, in relevant part:

(1) Any person who, or in connection with any goods or services, ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, ... [or] false or misleading description of fact, or false or misleading representation of fact, which –

\* \* \* \* \* \*

(B) in commercial advertising or promotion misrepresents the nature, characteristics, qualities, ... [of] another person's goods services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
15 U.S.C. § 1125(a)(1)(B).

in interstate commerce; and (5) there is a likelihood of injury and/or a loss in goodwill. *Birthright,* 827 F.Supp. at 1138; *U.S. Healthcare,* 898 F.2d at 922–23. All of these elements are present in this case.

### False or Misleading Statements

 Plaintiff alleges that defendants have made false or misleading statements pertaining to the product because NTC's advertisements promoted the NetWare software it sold as "original" versions of the software when it was actually selling "upgrade" versions. In this regard, NTC's advertisements incorporated pictures of the software box Novell uses for "original" software, in connection with sales by NTC of "upgrade" software to customers. NTC's advertisements and direct mailers did not disclose to the purchaser that they would be ineligible to register the software with Novell once purchased, nor that NTC was not authorized to sell it. Finally, some of NTC's advertisements included language stating that the low prices were offered as a "Special Novell Promotional Package." NTC contends that using the phrase "Special Novell Promotional Package" in its advertising only meant that it was attempting to sell a unique product, and that as characterized in this way it did not mislead customers. NTC's argument is not persuasive.

This Court finds and rules that Novell has satisfied the first element of the false advertising claim. Manifestly, words and pictures used by NTC in its advertisements constitute false and misleading statements pertaining to the product sought to be sold.

### Deception and Likelihood of Influencing Purchasing Decisions

The second and third elements of Novell's false advertising claim relate to whether there was actual deception or a tendency of deception and whether the deception was material. As stated in the prior discussion concerning the trademark infringement claim, customers of Novell as well as NTC were actually deceived in some cases, and the likelihood of confusion was real. Moreover, material deception is evidenced by the com-

plaints from end-users and the number of product returns to NTC from disgruntled customers.

This Court finds and rules that the second and third elements of Novell's false advertising claim are established and satisfied.

### Interstate Commerce

The fourth element of the false advertising claim is not contested. NTC does not dispute that it conducted business throughout the United States, and that plaintiff meets the interstate commerce element.

### Likelihood of Injury for Loss of Goodwill

Finally, plaintiff has demonstrated a loss of goodwill and the likelihood of injury. In this regard, Novell has established that it sustained lost sales and profits as a result of NTC's conduct, and that the loss of goodwill extends beyond the distributors to the end-users who were misled by NTC.

This Court finds that NTC has misled purchasers of the NetWare product and that the defendants have failed to disclose material facts in their advertising.

Based upon the foregoing, this Court finds that Novell has satisfied the elements of a claim of false advertising under Section 43(a)(1)(B) of the Lanham Act. Because no genuine issue of material fact exists, plaintiff is entitled to summary judgment on its claim of false advertising.

## III COPYRIGHT INFRINGEMENT

In its third claim, plaintiff alleges that NTC caused NetWare software to be copied by ineligible end-users, and that NTC distributed NetWare "upgrade" software versions 3.12, 4.0, and 4.1 without authorization and against Novell's established "upgrade" distribution policy.

 To prove copyright infringement under 17 U.S.C. § 106, two elements must be established: 1) ownership of a valid copyright; and 2) unauthorized "copying" of protectable elements of a copyrighted work. *Country Kids 'N City Slicks, Inc. v. Sheen,* 77 F.3d 1280, 1284 (10th Cir.1996).[11]

---

11. " 'Copying' is regularly used as shorthand to refer to the infringement of a copyright holder's

exclusive rights under a copyright." *Country Kids 'N City Slicks, Id.* at 1284, n. 2.

### A) Copyright Ownership

█ It is undisputed that Novell owns valid copyrights for its NetWare software and therefore satisfies the first element of copyright infringement. Valid certificates of federal copyright registration are prima facie evidence of copyright ownership. *Gates Rubber Co. v. Bando Chem. Indus., Ltd.*, 9 F.3d 823, 831 (10th Cir.1993). Novell has federal certificates of copyright registration for its NetWare software. It is the sole owner of all rights, title and interest in the copyrights and certificates of registration. Accordingly, this Court finds that Novell meets the first element of copyright infringement.

### B) Unauthorized Copying of a Protected Work

█ Copyright infringement exists when any of the rights granted under 17 U.S.C. § 106 are violated. *See, Buck v. Jewell–La Salle*, 283 U.S. 191, 51 S.Ct. 410, 75 L.Ed. 971 (1931).

#### 1) Unlawful Copying Via Contributory Infringement

Section 106(1) of the Copyright statute defines copyright infringement as the unauthorized reproduction of the copyrighted work.[12] In order to use NetWare, the contents of the diskettes purchased from a distributor must be copied by the purchaser/end-user onto the hard drive of a computer. It is "clear that the input of a work into a computer results in the making of a copy, and hence, that such *unauthorized* input infringes the copyright owner's reproduction rights." *Nimmer on Copyright*, § 8.08 (1996) (emphasis added).

█ Novell alleges liability based on a theory of contributory infringement. Novell claims that by making unauthorized sales of "upgrade" versions of NetWare to purchasers, in contravention of Novell's licensing policy, NTC causes such end-users to infringe. In this regard, Novell claims that such purchasers, without valid licenses to make unauthorized copies of the protected software, infringe the Novell copyright when they load the software onto their computers.

Defendants argue that they come within an exception to § 106 which provides that an *"owner* of a copy of a computer program" who makes a copy of the program "as an essential step in the utilization of the computer program in conjunction with a machine..." is not liable for copyright infringement. 17 U.S.C. § 117(1) (emphasis added). Since owners, without restriction, may copy software onto the hard drive of their computers or into temporary memory, copyright infringement would not result if the end-user is the "owner." Accordingly, the issue presented is whether end-users of NetWare purchased from NTC are "owners" of the software, or merely "licensees" thereof.

█ In *Advent Sys. Ltd. v. Unisys Corp.*, the Third Circuit determined that software is a "good" within the meaning of the Uniform Commercial Code (U.C.C.).[13] 925 F.2d 670, 676 (3d Cir.1991). Other courts have also determined that the U.C.C. should apply to software and that the sale of software constitutes the sale of a good. *See, Step–Saver Data Sys., Inc. v. Wyse Technology*, 939 F.2d 91, 99–100 (3d Cir.1991); *Downriver Internists v. Harris Corp.*, 929 F.2d 1147, 1150 (6th Cir.1991). If it is established that the transaction wherein the end-user obtains possession of the software is a sale, the so called "first sale" doctrine, applies.[14] Under

---

**12.** Section 106(1) provides in relevant part:
> [T]he owner of copyright under this title has the exclusive rights to do and to authorize any of the following:
> > (1) to reproduce the copyrighted work in copies or phonorecords.
>
> 17 U.S.C. § 106.

**13.** The court in *Advent* compared the software industry to that of recorded music and lecture notes:
> An analogy can be drawn to a compact disc recording of an orchestral rendition. The music is produced by the artistry of musicians and in itself is not a "good," but when transferred to a laser-readable disc becomes a readily merchantable commodity. Similarly, when a professor delivers a lecture, it is not a good, but, when transcribed as a book, it becomes a good.
>
> 925 F.2d at 676.

**14.** The "first sale" doctrine, as outlined in 17 U.S.C. § 109, provides in relevant part as follows:

that doctrine, the owner/purchaser of a copyrighted product is authorized to dispose of the product without regard to the desires or policies of the copyright holder.[15]

NTC argues that it was an *owner* because it purchased NetWare software from authorized distributors in compliance with Novell's "upgrade" policy which required the purchaser to hold title to an older version of networking software. NTC then argues that because it bought and sold the software as a *good*, as defined by the U.C.C., its customers also became *owners* of the NetWare software they purchased from NTC. NTC maintains that when it sold the software to end-users, unopened and unaltered, it relinquished all rights to the software and therefore it was not and is not liable for copyright infringement.

 Novell argues that it retains ownership and that the "shrinkwrap" license[16] included with each copy of NetWare is binding, giving to authorized purchasers only a license to use the software. Novell submits that the license only allows end-users who have purchased the software in compliance with the "upgrade" policy to copy the software onto the hard drive.

Most courts that have addressed the validity of the shrinkwrap license have found them to be invalid, characterizing them as contracts of adhesion, unconscionable, and/or unacceptable pursuant to the U.C.C. *Step–Saver*, 939 F.2d 91; *Vault Corp. v. Quaid Software Ltd.*, 847 F.2d 255 (5th Cir.1988); Rich, *Mass Market Software and the Shrinkwrap License*, 23 Colo. Law. 1321.[17] A minority of courts have determined that the shrinkwrap license is valid and enforceable. *See, ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1453 (7th Cir.1996); *Microsoft v. Harmony Computers*, 846 F.Supp. 208, 212 (E.D.N.Y. 1994).

 This Court holds that transactions making up the distribution chain from Novell through NTC to the end-user are "sales" governed by the U.C.C. Therefore, the first sale doctrine applies. It follows that the purchaser is an "owner" by way of sale and is entitled to the use and enjoyment of the software with the same rights as exist in the purchase of any other good. Said software transactions do not merely constitute the sale of a license to use the software. The shrinkwrap license included with the software is therefore invalid as against such a purchaser insofar as it purports to maintain title to the software in the copyright owner.

Based upon the foregoing, this Court rules that NTC's customers who obtained legally copyrighted materials from NTC did not vio-

(a) Notwithstanding the provisions of section 106(3), the owner of a particular copy... lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy....

**15.** The Historical Note to 17 U.S.C. § 109 states in relevant part:

[W]here the copyright owner has transferred ownership of a particular copy ... the person to whom the copy ... is transferred is entitled to dispose of it by sale, rental, or any other means. Under this principle, which has been established by the court decisions ... the copyright owner's exclusive right of public distribution would have no effect upon anyone who owns "a particular copy or phonorecord lawfully made under this title" and who wishes to transfer it to someone else or destroy it.

Historical Note to 17 U.S.C. § 109.

**16.** The term "shrinkwrap" license is used to describe the box-top license generally provided with the sale of software. Once the software

package is opened the purchaser is presented with the license, and is supposed to then read and understand it. Once read the purchaser then has the option of accepting the conditions within the license by proceeding to use or install the software, or the purchaser may choose to reject the license and return the un-used software for a refund. The purported license attempts to limit the rights of possessors of the software by prohibiting copying and distribution of the software, and retains ownership of the software with the copyright holder.

**17.** The rationale in support of the majority position is that software users generally purchase the software through a retailer and consider the transaction as complete once the exchange of the software package is made at the register for the money. Later, as the new end-users attempt to use the software for the first time, they are presented an additional document setting forth conditions that in essence modify the original purchase agreement with the retailer. Courts are loathe to rule that such end-users should lose the benefits of ownership they had originally bargained for.

late the law and are therefore entitled to use the software in accordance with its intended use, including unrestricted copying of the software onto their hard drives.

*Unlawful Distribution*

 Plaintiff also alleges that NTC committed copyright infringement by selling the "upgrade" version of NetWare to unauthorized end-users. Section 106(3) empowers the owner of a valid copyright to control the distribution of its products through authorized distributors.[18] *Microsoft v. Grey Computer,* 910 F.Supp. 1077, 1084 (D.Md.1995).

Distributors may obtain authorization to sell NetWare software only through written agreements. Among other things, these agreements establish the procedure each distributor must follow to sell "upgrade" software to end-users. It is clearly established that NTC does not have a written agreement with Novell to act as an authorized distributor.

 Notwithstanding the status of NTC as a wholly unauthorized distributor, NTC obtained its inventory of NetWare "upgrade" software by complying with the requirements necessary under Novell's upgrade distribution policy. There was no agreement between Novell and NTC which per se prevented NTC from reselling the software or otherwise limited NTC's business practices. This is so because Novell relinquished its rights to control the software once it was sold without restriction to NTC. Under the first sale doctrine, NTC was able to redistribute the software to end-users without copyright infringement. Transfer of a copyrighted work that is subject to the first sale doctrine extinguishes all distribution rights of the copyright holder upon transfer of title. *T.B. Harms Co. v. Jem Records, Inc.,* 655 F.Supp. 1575 (D.N.J.1987). Accordingly, there was no copyright infringement because NTC was only reselling the software it had lawfully purchased. 17 U.S.C. § 109. However, as this court has already ruled, such resales could not be properly effectuated

without liability in defendants where transactions involve trademark infringement, unfair competition, or false advertising in violation of the Lanham Act.

Based upon the foregoing, this Court finds that NTC is not liable for contributory infringement by causing the software to be copied by unauthorized end-users. Further, NTC has not committed copyright infringement by distributing NetWare without authorization to unauthorized end-users. Since the relevant facts are undisputed and no genuine issue of material fact remains, summary judgment as to Novell's copyright infringement claim is granted in favor of the defendants.

## IV INDIVIDUAL LIABILITY OF MARK BONDIETT

 Plaintiff has also moved for summary judgment on trademark infringement and unfair competition against Mark Bondiett, the sole shareholder, director, and officer of NTC. Corporate officers can be held personally liable for trademark infringement and unfair competition committed by the corporation "if the officer is a moving, active conscious force behind the infringement." *Bambu Sales, Inc. v. Sultana Crackers, Inc.,* 683 F.Supp. 899, 913 (E.D.N.Y.1988) (citations omitted). Furthermore, the officer need not be aware that his conduct will result in infringement. *Id.* at 914.

 The undisputed facts of this case are that Bondiett was the founder of NTC, and that he is the sole shareholder, director, and officer of the company. Plaintiff alleges, and the facts show, that Bondiett "authorized and approved the acts of unfair competition" and trademark infringement which led to the production and publication of NTC's infringing advertisements. *Id.* at 913. Bondiett knew, planned, and participated in directing his company's operations. This included the supervision of infringing advertisement campaigns.

---

**18.** Section 106(3) provides in relevant part:

[T]he owner of copyright under this title has the exclusive rights to do and to authorize any of the following:

(3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending.

17 U.S.C. § 106(3).

This Court concludes that Bondiett's role in the company constituted a "moving, active conscious force" behind NTC's operations, including the use of the infringing advertisements. Accordingly, summary judgment is appropriate on this issue in favor of Novell against Bondiett as to the trademark infringement, unfair competition, and false advertising committed by NTC.

## V DEFENDANTS' COUNTERCLAIMS

Plaintiff has moved for summary judgment on defendants' counterclaims. As to counterclaims one, two, and three, the court exercises its discretion and dismisses such pendant state claims without prejudice. Defendants' two remaining counterclaims are for federal anti-trust violations under the Sherman Act and the Clayton Act, and for violations of the Racketeer Influenced and Corrupt Organizations Act (RICO).

Defendants' allegations of anti-trust violations are based on two factual points. First, that plaintiff maintains a monopoly as evidenced by the higher prices it charges for its product. Second, that plaintiff is acting anti-competitively in its attempt to stop the defendants from selling Novell products. This Court finds no factual or legal basis for either finding. To the contrary, the record herein supports the opposite finding.

Evidence of higher prices for NetWare software and attempts to stop NTC from selling NetWare are not evidence of monopolistic power. A company's development in a market as a consequence of a superior product, business acumen, or historic accident does not prove monopolization. *City of Chanute v. Williams Natural Gas Co.*, 955 F.2d 641, 654 (10th Cir.), *cert. denied*, 506 U.S. 831, 113 S.Ct. 96, 121 L.Ed.2d 57 (1992). This Court finds that the evidence in this record shows an abundance of competition in the market of networking software, and within the business of selling NetWare, as evidenced by the thousands of distributors authorized by Novell to sell NetWare. The existence of a more expensive product is a demonstration of customer preference, quality, and service such as technical support. The fact that NTC has never been authorized to sell NetWare is a lawful decision of the plaintiff and does not prove monopolistic activities in this case.

This Court also finds that defendants' RICO Act counterclaim must fail as a result of the finding that NTC and Bondiett are liable for infringement. NTC's allegation that Novell has filed false and unjustified claims against the defendants is undercut and rendered untenable by the finding that defendants are liable for trademark infringement. Defendants have done little more than make conclusory allegations of a violation. Accordingly, this Court grants plaintiff's motion for summary judgment on the aforesaid two federal counterclaims for the reason that it affirmatively appears from the record before the Court that no reasonable jury could find for the defendants on either federal claim. Summary judgment is appropriate where no reasonable trier of fact could find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

## VI INJUNCTIVE RELIEF AND DAMAGES

This Court finds that defendants' continuing business practices which result in liability for trademark infringement, unfair competition, and false advertising require injunctive relief for Novell. Accordingly, defendants are enjoined from further acts of reproducing, copying and/or using Novell's trademarks in connection with the sale, offering for sale, distribution, and/or advertising of Novell software and documentation.

Material issues of fact remain as to the issue of damages. In this regard, further proceedings, perhaps before a court appointed master, may be necessary to properly determine the extent of defendants' infringement and damages.

## VII MOTION FOR SANCTIONS AND MOTION TO STRIKE OPPOSITION MEMORANDUM AND FOR ATTORNEY'S FEES

Plaintiff's motion for sanctions and motion to strike opposition memorandum are denied. This Court considers that sanctions are inappropriate with regard to these claimed dis-

covery violations, and rules that defendants' attempt to comply with the November 18, 1996 Order of Magistrate Judge Boyce was bona fide and in good faith. Likewise, defendants' second filed memorandum, though similar, contained helpful reorganization and some new material. Accordingly, plaintiff's motion for sanctions and for attorney's fees is denied.

Based upon the foregoing, it is hereby

ORDERED, that plaintiff's motion for summary judgment on counts one through four is GRANTED in part and DENIED in part. Defendants are liable for trademark infringement, unfair competition and false advertising under the Lanham Act. Defendants are not liable for copyright infringement under the Copyright Act; it is

FURTHER ORDERED, that plaintiff's motion for injunctive relief as to trademark infringement, unfair competition, and false advertising is granted; it is

FURTHER ORDERED, that plaintiff's motion for summary judgment as to defendants' counterclaims is GRANTED; it is

FURTHER ORDERED, that plaintiff's motion for sanctions is DENIED; it is

FURTHER ORDERED, that plaintiff's motion to strike opposition memorandum and for attorney's fees is DENIED; it is

FURTHER ORDERED, that defendants' motion for partial summary judgment as to liability on all claims is DENIED, except as to plaintiff's count concerning copyright infringement.

Counsel for plaintiff is directed to prepare and lodge with the court within 30 days a form of judgment after first complying with local Rule 206(b).